# COLORADO *v.* BERTINE

No. 85–889.  Argued November 10, 1986—Decided January 14, 1987

REHNQUIST, C. J., delivered the opinion of the Court, in which WHITE, BLACKMUN, POWELL, STEVENS, O'CONNOR, and SCALIA, JJ., joined. BLACKMUN, J., filed a concurring opinion, in which POWELL and O'CONNOR, JJ., joined, *post*, p. 376. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 377.

*John M. Haried* argued the cause for petitioner. With him on the briefs were *C. Phillip Miller* and *Richard F. Good.*

*Richard J. Lazarus* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Fried, Assistant Attorney General Trott,* and *Deputy Solicitor General Bryson.*

*Cary C. Lacklen* argued the cause for respondent. With him on the brief were *David F. Vela* and *Thomas M. Van Cleave III.**

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

On February 10, 1984, a police officer in Boulder, Colorado, arrested respondent Steven Lee Bertine for driving while under the influence of alcohol. After Bertine was taken into custody and before the arrival of a tow truck to take Bertine's van to an impoundment lot,[1] a backup officer

---

*Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *Larry W. Yackle* and *George Kannar;* and for the Colorado Criminal Defense Bar, Inc., et al. by *John M. Richilano* and *Mary G. Allen.*

[1] Section 7–7–2(a)(4) of the Boulder Revised Code authorizes police officers to impound vehicles when drivers are taken into custody. Section 7–7–2(a)(4) provides:

"A peace officer is authorized to remove or cause to be removed a vehicle from any street, parking lot, or driveway when:

.        .        .        .        .

inventoried the contents of the van. The officer opened a closed backpack in which he found controlled substances, cocaine paraphernalia, and a large amount of cash. Bertine was subsequently charged with driving while under the influence of alcohol, unlawful possession of cocaine with intent to dispense, sell, and distribute, and unlawful possession of methaqualone. We are asked to decide whether the Fourth Amendment prohibits the State from proving these charges with the evidence discovered during the inventory of Bertine's van. We hold that it does not.

The backup officer inventoried the van in accordance with local police procedures, which require a detailed inspection and inventory of impounded vehicles. He found the backpack directly behind the frontseat of the van. Inside the pack, the officer observed a nylon bag containing metal canisters. Opening the canisters, the officer discovered that they contained cocaine, methaqualone tablets, cocaine paraphernalia, and $700 in cash. In an outside zippered pouch of the backpack, he also found $210 in cash in a sealed envelope. After completing the inventory of the van, the officer had the van towed to an impound lot and brought the backpack, money, and contraband to the police station.

After Bertine was charged with the offenses described above, he moved to suppress the evidence found during the inventory search on the ground, *inter alia*, that the search of the closed backpack and containers exceeded the permissible scope of such a search under the Fourth Amendment. The Colorado trial court ruled that probable cause supported Bertine's arrest and that the police officers had made the decisions to impound the vehicle and to conduct a thorough inventory search in good faith. Although noting that the inventory of the vehicle was performed in a "somewhat slipshod" manner, the District Court concluded that "the search of the backpack was done for the purpose of protecting the

---

(4) The driver of a vehicle is taken into custody by the police department." Boulder Rev. Code § 7–7–2(a)(4)(1981).

owner's property, protection of the police from subsequent claims of loss or stolen property, and the protection of the police from dangerous instrumentalities." App. 81–83. The court observed that the standard procedures for impounding vehicles mandated a "detailed inventory involving the opening of containers and the listing of [their] contents." *Id.*, at 81. Based on these findings, the court determined that the inventory search did not violate Bertine's rights under the Fourth Amendment of the United States Constitution. *Id.*, at 83. The court, nevertheless, granted Bertine's motion to suppress, holding that the inventory search violated the Colorado Constitution.

On the State's interlocutory appeal, the Supreme Court of Colorado affirmed. 706 P. 2d 411 (1985). In contrast to the District Court, however, the Colorado Supreme Court premised its ruling on the United States Constitution. The court recognized that in *South Dakota* v. *Opperman*, 428 U. S. 364 (1976), we had held inventory searches of automobiles to be consistent with the Fourth Amendment, and that in *Illinois* v. *Lafayette*, 462 U. S. 640 (1983), we had held that the inventory search of personal effects of an arrestee at a police station was also permissible under that Amendment. The Supreme Court of Colorado felt, however, that our decisions in *Arkansas* v. *Sanders*, 442 U. S. 753 (1979), and *United States* v. *Chadwick*, 433 U. S. 1 (1977), holding searches of closed trunks and suitcases to violate the Fourth Amendment, meant that *Opperman* and *Lafayette* did not govern this case.[2]

We granted certiorari to consider the important and recurring question of federal law decided by the Colorado Supreme

---

[2] Two justices dissented from the majority opinion, arguing that *South Dakota* v. *Opperman* and *Illinois* v. *Lafayette* compel the conclusion that the inventory search of the backpack found in Bertine's van was permissible under the Fourth Amendment.

Court.[3]  475 U. S. 1081 (1986).  As that court recognized, inventory searches are now a well-defined exception to the warrant requirement of the Fourth Amendment.  See *Lafayette, supra,* at 643; *Opperman, supra,* at 367–376.  The policies behind the warrant requirement are not implicated in an inventory search, *Opperman,* 428 U. S., at 370, n. 5, nor is the related concept of probable cause:

> "The standard of probable cause is peculiarly related to criminal investigations, not routine, noncriminal procedures. . . . The probable-cause approach is unhelpful when analysis centers upon the reasonableness of routine administrative caretaking functions, particularly when no claim is made that the protective procedures are a subterfuge for criminal investigations."  *Ibid.*

See also *United States* v. *Chadwick, supra,* at 10, n. 5.  For these reasons, the Colorado Supreme Court's reliance on *Arkansas* v. *Sanders, supra,* and *United States* v. *Chadwick, supra,* was incorrect.  Both of these cases concerned searches solely for the purpose of investigating criminal conduct, with the validity of the searches therefore dependent on the application of the probable-cause and warrant requirements of the Fourth Amendment.

By contrast, an inventory search may be "reasonable" under the Fourth Amendment even though it is not conducted pursuant to a warrant based upon probable cause.  In

---

[3] Since our decision in *South Dakota* v. *Opperman,* several courts have confronted the issue whether police may inventory the contents of containers found in vehicles taken into police custody.  See, *e. g., United States* v. *Griffin,* 729 F. 2d 475 (CA7) (upholding inventory search of package found in paper bag), cert. denied, 469 U. S. 830 (1984); *United States* v. *Bloomfield,* 594 F. 2d 1200 (CA8 1979) (affirming suppression of evidence found in closed knapsack); *People* v. *Braasch,* 122 Ill. App. 3d 747, 461 N. E. 2d 651 (1984) (upholding inventory of paper bag); *People* v. *Gonzalez,* 62 N. Y. 2d 386, 465 N. E. 2d 823 (1984) (upholding inventory of paper bag); *Boggs* v. *Commonwealth,* 229 Va. 501, 331 S. E. 2d 407 (1985) (upholding inventory of boxes and pouch found in bag), cert. denied, 475 U. S. 1031 (1986).

*Opperman*, this Court assessed the reasonableness of an inventory search of the glove compartment in an abandoned automobile impounded by the police.   We found that inventory procedures serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger.   In light of these strong governmental interests and the diminished expectation of privacy in an automobile, we upheld the search.   In reaching this decision, we observed that our cases accorded deference to police caretaking procedures designed to secure and protect vehicles and their contents within police custody.   See *Cooper* v. *California*, 386 U. S. 58, 61–62 (1967); *Harris* v. *United States*, 390 U. S. 234, 236 (1968); *Cady* v. *Dombrowski*, 413 U. S. 433, 447–448 (1973).[4]

In our more recent decision, *Lafayette*, a police officer conducted an inventory search of the contents of a shoulder bag in the possession of an individual being taken into custody.   In deciding whether this search was reasonable, we recognized that the search served legitimate governmental interests similar to those identified in *Opperman*. We determined that those interests outweighed the individual's Fourth Amendment interests and upheld the search.

In the present case, as in *Opperman* and *Lafayette*, there was no showing that the police, who were following standardized procedures, acted in bad faith or for the sole purpose of investigation.   In addition, the governmental interests justifying the inventory searches in *Opperman* and *Lafayette* are

---

[4] The Colorado Supreme Court correctly stated that *Opperman* did not address the question whether the scope of an inventory search may extend to closed containers located in the interior of an impounded vehicle.   We did note, however, that "'when the police take custody of any sort of container [such as] an automobile . . . it is reasonable to search the container to itemize the property to be held by the police.'"   428 U. S., at 371 (quoting *United States* v. *Gravitt*, 484 F. 2d 375, 378 (CA5 1973), cert. denied, 414 U. S. 1135 (1974)).

nearly the same as those which obtain here. In each case, the police were potentially responsible for the property taken into their custody. By securing the property, the police protected the property from unauthorized interference. Knowledge of the precise nature of the property helped guard against claims of theft, vandalism, or negligence. Such knowledge also helped to avert any danger to police or others that may have been posed by the property.[5]

The Supreme Court of Colorado opined that *Lafayette* was not controlling here because there was no danger of introducing contraband or weapons into a jail facility. Our opinion in *Lafayette*, however, did not suggest that the station-house setting of the inventory search was critical to our holding in that case. Both in the present case and in *Lafayette*, the common governmental interests described above were served by the inventory searches.

The Supreme Court of Colorado also expressed the view that the search in this case was unreasonable because Bertine's van was towed to a secure, lighted facility and because Bertine himself could have been offered the opportunity to make other arrangements for the safekeeping of his property. But the security of the storage facility does not completely eliminate the need for inventorying; the police may still wish to protect themselves or the owners of the lot against false claims of theft or dangerous instrumentalities. And while giving Bertine an opportunity to make alterna-

---

[5] In arguing that the latter two interests are not implicated here, the dissent overlooks the testimony of the backup officer who conducted the inventory of Bertine's van. According to the officer, the vehicle inventory procedures of the Boulder Police Department are designed for the "[p]rotection of the police department" in the event that an individual later claims that "there was something of value taken from within the vehicle." 2 Tr. 19. The officer added that inventories are also conducted in order to check "[f]or any dangerous items such as explosives [or] weapons." *Id.*, at 20. The officer testified that he had found such items in vehicles.

tive arrangements would undoubtedly have been possible, we said in *Lafayette:*

> "[T]he real question is not what 'could have been achieved,' but whether the Fourth Amendment *requires* such steps . . . .
>
> "The reasonableness of any particular governmental activity does not necessarily or invariably turn on the existence of alternative 'less intrusive' means." *Lafayette,* 462 U. S., at 647 (emphasis in original).

See *Cady* v. *Dombrowski, supra,* at 447; *United States* v. *Martinez-Fuerte,* 428 U. S. 543, 557, n. 12 (1976). We conclude that here, as in *Lafayette,* reasonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment, even though courts might as a matter of hindsight be able to devise equally reasonable rules requiring a different procedure.[6]

The Supreme Court of Colorado also thought it necessary to require that police, before inventorying a container, weigh the strength of the individual's privacy interest in the container against the possibility that the container might serve as a repository for dangerous or valuable items. We think that such a requirement is contrary to our decisions in

---

[6] We emphasize that, in this case, the trial court found that the Police Department's procedures mandated the opening of closed containers and the listing of their contents. Our decisions have always adhered to the requirement that inventories be conducted according to standardized criteria. See *Lafayette,* 462 U. S., at 648; *Opperman,* 428 U. S., at 374–375.

By quoting a portion of the Colorado Supreme Court's decision out of context, the dissent suggests that the inventory here was not authorized by the standard procedures of the Boulder Police Department. See *post,* at 380–381. Yet that court specifically stated that the procedure followed here was "officially authorized." 706 P. 2d 411, 413, n. 2 (1985). In addition, the court did not disturb the trial court's finding that the police procedures for impounding vehicles required a detailed inventory of Bertine's van. See *id.,* at 418–419.

*Opperman* and *Lafayette,* and by analogy to our decision in *United States* v. *Ross,* 456 U. S. 798 (1982):

> "Even if less intrusive means existed of protecting some particular types of property, it would be unreasonable to expect police officers in the everyday course of business to make fine and subtle distinctions in deciding which containers or items may be searched and which must be sealed as a unit." *Lafayette, supra,* at 648.

> "When a legitimate search is under way, and when its purpose and its limits have been precisely defined, nice distinctions between closets, drawers, and containers, in the case of a home, or between glove compartments, upholstered seats, trunks, and wrapped packages, in the case of a vehicle, must give way to the interest in the prompt and efficient completion of the task at hand." *United States* v. *Ross, supra,* at 821.

We reaffirm these principles here: " '[a] single familiar standard is essential to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront.' " *Lafayette, supra,* at 648 (quoting *New York* v. *Belton,* 453 U. S. 454, 458 (1981)).

Bertine finally argues that the inventory search of his van was unconstitutional because departmental regulations gave the police officers discretion to choose between impounding his van and parking and locking it in a public parking place. The Supreme Court of Colorado did not rely on this argument in reaching its conclusion, and we reject it. Nothing in *Opperman* or *Lafayette* prohibits the exercise of police discretion so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity. Here, the discretion afforded the Boulder police was exercised in light of

standardized criteria, related to the feasibility and appropriateness of parking and locking a vehicle rather than impounding it.[7] There was no showing that the police chose to impound Bertine's van in order to investigate suspected criminal activity.

While both *Opperman* and *Lafayette* are distinguishable from the present case on their facts, we think that the principles enunciated in those cases govern the present one. The judgment of the Supreme Court of Colorado is therefore

*Reversed.*

JUSTICE BLACKMUN, with whom JUSTICE POWELL and JUSTICE O'CONNOR join, concurring.

The Court today holds that police officers may open closed containers while conducting a routine inventory search of an impounded vehicle. I join the Court's opinion, but write separately to underscore the importance of having such inventories conducted only pursuant to standardized police procedures. The underlying rationale for allowing an inventory exception to the Fourth Amendment warrant rule is that police officers are not vested with discretion to determine the scope of the inventory search. See *South Dakota v. Opperman*, 428 U. S. 364, 382–383 (1976) (POWELL, J., concurring). This absence of discretion ensures that inventory searches will not be used as a purposeful and general means of discovering evidence of crime. Thus, it is permis-

---

[7] In arguing that the Boulder Police Department procedures set forth no standardized criteria guiding an officer's decision to impound a vehicle, the dissent selectively quotes from the police directive concerning the care and security of vehicles taken into police custody. The dissent fails to mention that the directive establishes several conditions that must be met before an officer may pursue the park-and-lock alternative. For example, police may not park and lock the vehicle where there is reasonable risk of damage or vandalism to the vehicle or where the approval of the arrestee cannot be obtained. App. 91–92, 94–95. Not only do such conditions circumscribe the discretion of individual officers, but they also protect the vehicle and its contents and minimize claims of property loss.

sible for police officers to open closed containers in an inventory search only if they are following standard police procedures that mandate the opening of such containers in every impounded vehicle. As the Court emphasizes, the trial court in this case found that the Police Department's standard procedures did mandate the opening of closed containers and the listing of their contents. See *ante*, at 374, n. 6.

JUSTICE MARSHALL, with whom JUSTICE BRENNAN joins, dissenting.

Recognizing that "both *Opperman* and *Lafayette* are distinguishable from the present case on their facts," *ante*, at 376, the majority applies the balancing test enunciated in those cases to uphold as reasonable the inventory of a closed container in a car impounded when its driver was placed under arrest. However, the distinctive facts of this case require a different result. This search—it cannot legitimately be labeled an inventory—was unreasonable and violated the Fourth Amendment. Unlike the inventories in *South Dakota* v. *Opperman*, 428 U. S. 364 (1976), and *Illinois* v. *Lafayette*, 462 U. S. 640 (1983), it was not conducted according to standardized procedures. Furthermore, the governmental interests justifying the intrusion are significantly weaker than the interests identified in either *Opperman* or *Lafayette* and the expectation of privacy is considerably stronger.

I

As the Court acknowledges, *ante*, at 374, and n. 6, and 375–376, inventory searches are reasonable only if conducted according to standardized procedures. In both *Opperman* and *Lafayette*, the Court relied on the absence of police discretion in determining that the inventory searches in question were reasonable. Chief Justice Burger's opinion in *Opperman* repeatedly referred to this standardized nature of inventory procedures. See 428 U. S., at 369, 372, 376. JUSTICE POWELL's concurring opinion in that case also

stressed that "no significant discretion is placed in the hands of the individual officer: he usually has no choice as to the subject of the search or its scope." *Id.*, at 384 (footnote omitted). Similarly, the Court in *Lafayette* emphasized the standardized procedure under which the station-house inventory was conducted. See 462 U. S., at 646, 647, 648; see also *id.*, at 649 (MARSHALL, J., concurring in judgment). In assessing the reasonableness of searches conducted in limited situations such as these, where we do not require probable cause or a warrant, we have consistently emphasized the need for such set procedures: "standardless and unconstrained discretion is the evil the Court has discerned when in previous cases it has insisted that the discretion of the official in the field be circumscribed, at least to some extent." *Delaware* v. *Prouse*, 440 U. S. 648, 661 (1979). See *Almeida-Sanchez* v. *United States*, 413 U. S. 266, 270 (1973); *Cady* v. *Dombrowski*, 413 U. S. 433, 443 (1973); *Harris* v. *United States*, 390 U. S. 234, 235 (1968); *Camara* v. *Municipal Court*, 387 U. S. 523, 532–533 (1967).

The Court today attempts to evade these clear prohibitions on unfettered police discretion by declaring that "the discretion afforded the Boulder police was exercised in light of standardized criteria, related to the feasibility and appropriateness of parking and locking a vehicle rather than impounding it." *Ante*, at 375–376. This vital assertion is flatly contradicted by the record in this case. The officer who conducted the inventory, Officer Reichenbach, testified at the suppression hearing that the decision not to "park and lock" respondent's vehicle was his "own individual discretionary decision." Tr. 76. Indeed, application of these supposedly standardized "criteria" upon which the Court so heavily relies would have yielded a different result in this case. Since there was ample public parking adjacent to the intersection where respondent was stopped, consideration of "feasibility" would certainly have militated in favor of the "park and lock"

option, not against it. I do not comprehend how consideration of "appropriateness" serves to channel a field officer's discretion; nonetheless, the "park and lock" option would seem particularly appropriate in this case, where respondent was stopped for a traffic offense and was not likely to be in custody for a significant length of time.

Indeed, the record indicates that *no* standardized criteria limit a Boulder police officer's discretion. According to a departmental directive,[1] after placing a driver under arrest, an officer has three options for disposing of the vehicle. First, he can allow a third party to take custody.[2] Second, the officer or the driver (depending on the nature of the arrest) may take the car to the nearest public parking facility, lock it, and take the keys.[3] Finally, the officer can do what was done in

---

[1] Subsections 7–7–2(a)(1) and 7–7–2(a)(4) of the Boulder Revised Code authorize police to impound a vehicle if the driver is taken into custody or if the vehicle obstructs traffic. A departmental directive authorizes inventory searches of impounded vehicles. See General Procedure issued from the office of the Chief of Police, Boulder Police Department, concerning Motor Vehicle Impounds, effective September 7, 1977, reproduced in App. 89–95.

[2] See *id.*, at 95.

[3] If the vehicle and its contents are not evidence of a crime and the owner consents, § III of the General Procedure provides, in relevant part:

"A. Upon placing the operator of a motor vehicle in custody, Officers *may* take the following steps in securing the arrestee's vehicle and property . . . :

.      .      .      .      .

"4. The Officer shall drive the vehicle off the roadway and legally park the vehicle in the nearest PUBLIC parking area. The date, time, and location where the vehicle is parked shall be indicated on the IMPOUND FORM.

"5. The Officer shall remove the ignition keys, and lock all doors of the vehicle.

"6. During the booking process, the arrestee shall be given a continuation form for his signature which indicates the location of his vehicle. One copy of the continuation form is to be retained in the case file." *Id.*, at 93–94 (emphasis added).

this case: impound the vehicle, and search and inventory its contents, including closed containers.[4]

Under the first option, the police have no occasion to search the automobile. Under the "park and lock" option, "[c]losed containers that give no indication of containing either valuables or a weapon *may not be opened and the contents searched* (i. e., inventoried)." App. 92–93 (emphasis added). Only if the police choose the third option are they entitled to search closed containers in the vehicle. Where the vehicle is not itself evidence of a crime,[5] as in this case, the police apparently have totally unbridled discretion as to which procedure to use. See 706 P. 2d 411, 413, n. 3 (Colo. 1985) ("[T]he Boulder Police Department's regulations and rules do not require that an automobile be inventoried and searched in accordance with the procedures followed in this

---

[4] Section II(A) of the General Procedure establishes the following impoundment procedures:

"1. If the vehicle or its contents have been used in the commission of a crime or are themselves the fruit of a crime, the Officer shall conduct a detailed vehicle inspection and inventory and record it upon the VEHICLE IMPOUND FORM.

"2. Personal items of value should be removed from the vehicle and subsequently placed into Property for safekeeping.

"3. The Officer shall request a Tow Truck, and upon its arrival have the Tow Truck operator sign the IMPOUND FORM, keeping one copy in his possession, before the Officer releases the vehicle for impoundment in the City of Boulder impoundment facility." *Id.*, at 90–91.

Subsection (B) of the directive provides that this procedure is also to be followed when a vehicle involved in a traffic accident is to be held for evidentiary purposes.

[5] Respondent's van was not evidence of a crime within the meaning of the departmental directive; Officer Reichenbach testified that it was not his practice to impound all cars following an arrest for driving while under the influence of alcohol. Tr. 61. The Memorandum also requires the "approval of the arrestee" before the police can "park and lock" his car, App. 92. In this case, however, respondent was never advised of this option and had no opportunity to consent. At the suppression hearing, he indicated that he would have consented to such a procedure. See Tr. 110.

case"). Consistent with this conclusion, Officer Reichenbach testified that such decisions were left to the discretion of the officer on the scene. App. 60.

Once a Boulder police officer has made this initial completely discretionary decision to impound a vehicle, he is given little guidance as to which areas to search and what sort of items to inventory. The arresting officer, Officer Toporek, testified at the suppression hearing as to what items would be inventoried: "That would I think be very individualistic as far as what an officer may or may not go into. I think whatever arouses his suspicious [sic] as far as what may be contained in any type of article in the car." *Id.*, at 78. In application, these so-called procedures left the breadth of the "inventory" to the whim of the individual officer. Clearly, "[t]he practical effect of this system is to leave the [owner] subject to the discretion of the official in the field." *Camara* v. *Municipal Court*, 387 U. S., at 532.

Inventory searches are not subject to the warrant requirement because they are conducted by the government as part of a "community caretaking" function, "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady* v. *Dombrowski*, 413 U. S., at 441. Standardized procedures are necessary to ensure that this narrow exception is not improperly used to justify, after the fact, a warrantless investigative foray. Accordingly, to invalidate a search that is conducted without established procedures, it is not necessary to establish that the police actually acted in bad faith, or that the inventory was in fact a "pretext." By allowing the police unfettered discretion, Boulder's discretionary scheme, like the random spot checks in *Delaware* v. *Prouse*, is unreasonable because of the "'grave danger' of abuse of discretion." 440 U. S., at 662.

## II

In *South Dakota* v. *Opperman*, 428 U. S. 364 (1976), and *Illinois* v. *Lafayette*, 462 U. S. 640 (1983), both of which

involved inventories conducted pursuant to standardized procedures, we balanced the individual's expectation of privacy against the government's interests to determine whether the search was reasonable. Even if the search in this case did constitute a legitimate inventory, it would nonetheless be unreasonable under this analysis.

## A

The Court greatly overstates the justifications for the inventory exception to the Fourth Amendment. Chief Justice Burger, writing for the majority in *Opperman*, relied on three governmental interests to justify the inventory search of an unlocked glove compartment in an automobile impounded for overtime parking: (i) "the protection of the owner's property while it remains in police custody"; (ii) "the protection of the police against claims or disputes over lost or stolen property"; and (iii) "the protection of the police from potential danger." 428 U. S., at 369. The majority finds that "nearly the same" interests obtain in this case. See *ante*, at 373. As JUSTICE POWELL's concurring opinion in *Opperman* reveals, however, only the first of these interests is actually served by an automobile inventory search.

The protection-against-claims interest did not justify the inventory search either in *Opperman*, see 428 U. S., at 378, n. 3 (POWELL, J., concurring), or in this case. As the majority apparently concedes, *ante*, at 373, the use of secure impoundment facilities effectively eliminates this concern.[6] As

---

[6] The impoundment lot in *South Dakota* v. *Opperman* was "the old county highway yard. It ha[d] a wooden fence partially around part of it, and kind of a dilapidated wire fence, a makeshift fence." 428 U. S., at 366, n. 1. See also *Cady* v. *Dombrowski*, 413 U. S. 433, 443 (1973) ("[T]he car was left outside, in a lot seven miles from the police station to which respondent had been taken, and no guard was posted over it"). By contrast, in the present case, respondent's vehicle was taken to a lighted, private storage lot with a locked 6-foot fence. The lot was patrolled by private security officers and police, and nothing had ever been stolen from a vehicle in the lot. App. 69–71.

to false claims, "inventories are [not] a completely effective means of discouraging false claims, since there remains the possibility of accompanying such claims with an assertion that an item was stolen prior to the inventory or was intentionally omitted from the police records." 428 U. S., at 378–379 (POWELL, J., concurring). See also *id.*, at 391, and nn. 9 and 10 (MARSHALL, J., dissenting); 2 W. LaFave, Search and Seizure § 5.5, p. 360, n. 50 (1978 and Supp. 1986).

Officer Reichenbach's inventory in this case would not have protected the police against claims lodged by respondent, false or otherwise. Indeed, the trial court's characterization of the inventory as "slip-shod" is the height of understatement. For example, Officer Reichenbach failed to list $150 in cash found in respondent's wallet or the contents of a sealed envelope marked "rent," $210, in the relevant section of the property form. Tr. 40–41; App. 41–42. His reports make no reference to other items of value, including respondent's credit cards, and a converter, a hydraulic jack, and a set of tire chains, worth a total of $125. Tr. 41, 62–63. The $700 in cash found in respondent's backpack, along with the contraband, appeared only on a property form completed later by someone other than Officer Reichenbach. *Id.*, at 81–82. The interior of the vehicle was left in disarray, *id.*, at 99, and the officer "inadvertently" retained respondent's keys—including his house keys—for two days following his arrest. *Id.*, at 116, 133–134.

The third interest—protecting the police from potential danger—failed to receive the endorsement of a majority of the Court in *Opperman*. After noting that "there is little danger associated with impounding unsearched vehicles," JUSTICE POWELL recognized that "there does not appear to be any effective way of identifying in advance those circumstances or classes of automobile impoundments which represent a greater risk." 428 U. S., at 378. See also *id.*, at 390 (MARSHALL, J., dissenting) (safety rationale "cannot justify the search of every car upon the basis of undifferentiated pos-

sibility of harm"). As with the charge of overtime parking in *Opperman*, there is nothing in the nature of the offense for which respondent was arrested that suggests he was likely to be carrying weapons, explosives, or other dangerous items. Cf. *Cady* v. *Dombrowski*, 413 U. S., at 436–437 (police reasonably believed that the defendant's service revolver was in the car). Not only is protecting the police from dangerous instrumentalities an attenuated justification for most automobile inventory searches, but opening closed containers to inventory the contents can only increase the risk. In the words of the District Court in *United States* v. *Cooper*, 428 F. Supp. 652, 654–655 (SD Ohio 1977): "The argument that the search was necessary to avoid a possible booby-trap is . . . easily refuted. No sane individual inspects for booby-traps by simply opening the container."

Thus, only the government's interest in protecting the owner's property actually justifies an inventory search of an impounded vehicle. See 428 U. S., at 379 (POWELL, J., concurring); *id.*, at 391 (MARSHALL, J., dissenting). While I continue to believe that preservation of property does not outweigh the privacy and security interests protected by the Fourth Amendment, I fail to see how preservation can even be asserted as a justification for the search in this case. In *Opperman*, the owner of the impounded car was not available to safeguard his possessions, see *id.*, at 375, and it could plausibly be argued that, in his absence, the police were entitled to act for his presumed benefit. See also *Cady* v. *Dombrowski, supra*, at 436 (comatose defendant). When the police conducted the inventory in *Opperman*, they could not predict how long the car would be left in their possession. See 428 U. S., at 379 (POWELL, J., concurring) ("[M]any owners might leave valuables in their automobiles temporarily that they would not leave there unattended for the several days that police custody may last"); cf. *Cooper* v. *California*, 386 U. S. 58, 61 (1967) (police retained car for four months pending forfeiture; length of time considered by the Court in as-

sessing reasonableness of inventory). In this case, however, the owner was "present to make other arrangements for the safekeeping of his belongings," *Opperman*, 428 U. S., at 375, yet the police made no attempt to ascertain whether in fact he wanted them to "safeguard" his property. Furthermore, since respondent was charged with a traffic offense, he was unlikely to remain in custody for more than a few hours. He might well have been willing to leave his valuables unattended in the locked van for such a short period of time. See Tr. 110 (had he been given the choice, respondent indicated at the suppression hearing that he "would have parked [the van] in the lot across the street [and] [h]ad somebody come and get it").

Thus, the government's interests in this case are weaker than in *Opperman*, but the search here is much more intrusive. *Opperman* did not involve a search of closed containers or other items that "'touch upon intimate areas of an individual's personal affairs,'" 428 U. S., at 380, and n. 7 (POWELL, J., concurring) (quoting *California Bankers Assn.* v. *Shultz*, 416 U. S. 21, 78–79 (1974) (POWELL, J., concurring)); nor can the Court's opinion be read to authorize the inspection of "containers which might themselves be sealed, removed and secured without further intrusion." 428 U. S., at 388, n. 6 (MARSHALL, J., dissenting). To expand the *Opperman* rationale to include containers in which the owner clearly has a reasonable expectation of privacy, the Court relies on *Illinois* v. *Lafayette*, 462 U. S. 640 (1983). Such reliance is fundamentally misplaced, however; the inventory in *Lafayette* was justified by considerations which are totally absent in this context.

In *Lafayette*, we upheld a station-house inventory search of an arrestee's shoulder bag. Notwithstanding the Court's assertions to the contrary, *ante*, at 373, the inventory in that case *was* justified primarily by compelling governmental interests unique to the station house, preincarceration context. There is a powerful interest in preventing the introduction

of contraband or weapons into a jail.[7]  "Arrested persons have also been known to injure themselves — or others — with belts, knives, drugs, or other items on their person while being detained.  Dangerous instrumentalities — such as razor blades, bombs, or weapons — can be concealed in innocent-looking articles taken from the arrestee's possession."  462 U. S., at 646.  Removing such items from persons about to be incarcerated is necessary to reasonable jail security; once these items have been identified and removed, "inventorying them is an entirely reasonable administrative procedure." *Ibid.*  Although *Lafayette* also involved the property justifications relied on in *Opperman,* I do not believe it can fairly be read to expand the scope of inventory searches where the pressing security concerns of the station house are absent.

## B

Not only are the government's interests weaker here than in *Opperman* and *Lafayette,* but respondent's privacy interest is greater.  In upholding the search in *Opperman,* the Court emphasized the fact that the defendant had a diminished expectation of privacy in his automobile, due to "pervasive and continuing governmental regulation and controls, including periodic inspection and licensing requirements" and "the obviously public nature of automobile travel."  428 U. S., at 368.  See also *id.,* at 379 (POWELL, J., concurring); but see *id.,* at 386–388 (MARSHALL, J., dissenting).  Similarly, in *Lafayette,* the Court emphasized the

---

[7] The importance of this justification to the outcome in *Illinois* v. *Lafayette* is amply demonstrated by the Court's direction on remand: "The record is unclear as to whether respondent was to have been incarcerated after being booked for disturbing the peace.  That is an appropriate inquiry on remand."  462 U. S., at 648, n. 3.  See also *id.,* at 649 (MARSHALL, J., concurring in judgment) ("I agree that the police do not need a warrant or probable cause to conduct an inventory search *prior to incarcerating a suspect*" (emphasis added)); see also *United States* v. *Robinson,* 414 U. S. 218, 258, n. 7 (1973) (MARSHALL, J., dissenting) (the justification for station-house searches is "the fact that the suspect will be placed in jail").

fact that the defendant was in custody at the time the inventory took place. 462 U. S., at 645–646.

Here the Court completely ignores respondent's expectation of privacy in his backpack. Whatever his expectation of privacy in his automobile generally, our prior decisions clearly establish that he retained a reasonable expectation of privacy in the backpack and its contents. See *Arkansas* v. *Sanders*, 442 U. S. 753, 762 (1979) ("[L]uggage is a common repository for one's personal effects, and therefore is inevitably associated with the expectation of privacy"); *United States* v. *Chadwick*, 433 U. S. 1, 13 (1977) ("[A] person's expectations of privacy in personal luggage are substantially greater than in an automobile"). Indeed, the Boulder police officer who conducted the inventory acknowledged that backpacks commonly serve as repositories for personal effects.[8] Thus, even if the governmental interests in this case were the same as those in *Opperman*, they would nonetheless be outweighed by respondent's comparatively greater expectation of privacy in his luggage.

## III

In *Coolidge* v. *New Hampshire*, 403 U. S. 443, 461–462 (1971), a plurality of this Court stated: "The word 'automobile' is not a talisman in whose presence the Fourth Amendment fades away and disappears." By upholding the search in this case, the Court not only ignores that principle, but creates another talisman to overcome the requirements of the Fourth Amendment—the term "inventory." Accordingly, I dissent.

---

[8] At the suppression hearing, Officer Reichenbach stated: "The average person on the street . . . carries items of personal value in the backpacks, wallets, checkbooks, text books." Tr. 23.