NOTICE
Decision filed 08/11/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 230612-U

NO. 5-23-0612

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Vermilion County. |
| | ) | |
| v. | ) | No. 22-CF-221 |
| | ) | |
| CARRIE B. CUNNINGHAM, | ) | Honorable |
| | ) | Derek J. Girton, |
| Defendant-Appellee. | ) | Judge, presiding. |

_____

JUSTICE SHOLAR delivered the judgment of the court.
Justice Cates concurred in the judgment.
Justice Barberis dissented.

**ORDER**

¶ 1   *Held*:   Suppression of evidence recovered from the unlawful search of defendant's purse is affirmed, because there is no indication in the record that the inventory was conducted pursuant to a standardized policy.

¶ 2   The defendant, Carrie B. Cunningham, filed a motion to suppress evidence, arguing that law enforcement unlawfully seized her purse. The circuit court granted the motion. The State appeals and argues that Deputy Gallentine's warrantless search of defendant's purse was conducted in good faith pursuant to established department policy and was therefore valid under the inventory search exception to the fourth amendment's warrant requirement. For the reasons that follow, we agree with defendant and affirm.

1

¶ 3                    I. BACKGROUND

¶ 4    On May 3, 2022, the State charged defendant by two count information with: count I, unlawful possession of methamphetamine, a Class 3 felony (720 ILCS 646/60(a) (West 2022)), and count II, possession of a controlled substance, a Class 4 felony (720 ILCS 570/402(c) (West 2022)). Count I alleged that on April 1, 2022, defendant knowingly and unlawfully had in her possession less than five grams of a substance containing methamphetamine, a controlled substance. Count II alleged that on April 2, 2022, defendant knowingly possessed a substance containing heroin. A grand jury later indicted defendant of the same charges.

¶ 5    On March 20, 2023, defendant filed a motion to suppress evidence. The motion to suppress indicated that on April 1, 2022, defendant drove a vehicle which collided with another vehicle in Vermilion County, Illinois. Deputy Gallentine arrived on scene of the accident. Deputy Gallentine observed a female lying in the ditch on the west side of the road receiving medical treatment. Deputy Gallentine reported that the female, later identified as defendant, wore a brown purse which was cut off her person while she was being treated by medical personnel. Deputy Gallentine reported that after the purse was removed, Captain Varvel of the Westville Police Department handed the purse to Sergeant Pasquale.

¶ 6    Deputy Gallentine reported that defendant was transported to Carle Hospital in Urbana, Illinois. Deputy Gallentine searched defendant's purse, where he found substances that field tested positive for heroin and methamphetamine. Defendant received tickets for improper lane usage, driving too fast for conditions/failure to reduce speed to avoid an accident, and operating an uninsured motor vehicle. Following the search of her purse, defendant was arrested and charged with unlawful possession of methamphetamine and possession of a controlled substance.

¶ 7    In the motion to suppress, defendant first argued that the search and seizure of defendant's purse was unreasonable. Defendant argued that an inventory search is dependent upon arrest or pending arrest and further detainment of an individual, relying upon *Illinois v. Lafayette*, 462 U.S. 640, 648 (1983). However, in this case, according to defendant, Deputy Gallentine did not report that defendant was arrested at the scene or would be arrested at a later time. As such, defendant argued that an inventory search of defendant's purse was unreasonable, and thus, the purse was illegally seized and searched. Defendant next argued that there were no exceptions to the warrant requirement to justify a warrantless search of defendant's purse, where defendant was not arrested at the time the purse was seized and searched. Therefore, defendant requested that the trial court suppress evidence obtained from the search of defendant's purse, including the methamphetamine and paraphernalia. Defendant later filed a memorandum of law in support of her position.

¶ 8    On April 3, 2023, the State filed its response. The State argued that the inventory search of defendant's purse was justified, where Deputy Gallentine's possession of the purse was "given to them by Georgetown Ambulance and their collective response to the traffic accident that [defendant] was injured in." According to the State, "Deputy Gallentine conducted an inventory of the purse and the contents therein to secure [defendant's] property as she was being takin [*sic*] to the hospital by Georgetown Ambulance leaving the purse and [defendant's] vehicle at the scene." The State contended that, "Inventory of [defendant's] property in these circumstances is consistent with Vermilion County Sheriff's Department practices to inventory and secure the property of all individuals, and not a search."

¶ 9    On July 20, 2023, the trial court held a hearing on the motion to suppress evidence. Deputy Gallentine of the Vermilion County Sheriff's Office testified. Deputy Gallentine was dispatched to the scene of a motor vehicle accident. He was not the first responder to the scene. Deputy

3

Gallentine testified that "EMS had already arrived on scene, and Captain Varvel, Westville PD was already there." Deputy Gallentine testified that defendant was "not in a good condition" upon his arrival. "She was laying in the ditch" "on her back" and "EMS was working on her." Deputy Gallentine testified that defendant "was in excruciating pain the entire time and screaming," and therefore he did not speak with her.

¶ 10    Deputy Gallentine testified that defendant was transported to Carle Hospital in Urbana by ambulance. Defendant's vehicle was "in disabling condition" and "needed to be towed from the scene." Deputy Gallentine "did an inventory of [the vehicle] prior to it being towed." Deputy Gallentine testified that defendant's purse was not in the vehicle. Regarding possession of the purse, Deputy Gallentine testified that:

> "I was working on the accident scene, EMS was working on her. Captain Varvel, I heard him say that it was cut off of her person, they are trying to get her on a stretcher, and from there it went to at the time Sergeant Pasquale. And then as I was working on the accident scene, got that done because the road was closed, the purse was on the trunk of the vehicle, to which I took possession of at that point."

¶ 11    Once he took possession of the purse, Deputy Gallentine testified that:

> "Once the accident scene was clear, we don't put things that could have value in them in a car that's going to be towed, it's a liability for us and for the tow company and the person, so at that point it was put in the rear of my patrol vehicle and once I got back to the Public Safety Building, that's when I did a full inventory of it so I could log all of it."

¶ 12    Deputy Gallentine testified that the full inventory entailed "miscellaneous debit cards and looked like gift cards I believe, an unknown—I can't remember the exact amount of currency that was inside, and then there was a black pouch that was found inside of the purse." Deputy Gallentine testified that he inventoried the purse because "it's a liability for us if we don't, and for her." He elaborated: "Our policy states that we do a full property inventory, that way everything can be logged, what's inside, what's not. That way we can't be held accountable."

4

¶ 13    Defendant introduced defendant's exhibit B, the Vermilion County Sheriff's Department policy on inventories. There was no objection to the exhibit and defense exhibit B was marked for identification. There was questioning regarding exhibit B, which established that the policy applies only to people under arrest and reflects the requirements of section 108-2 of the Code of Criminal Procedure of 1963 (725 ILCS 5/108-2 (West 2020)). Notably, exhibit B was never introduced into evidence.

¶ 14    Deputy Gallentine testified that prior to inventorying the purse, defendant was not arrested. He did not contemplate that she would be arrested, but she was given tickets because of the accident. Deputy Gallentine indicated that this was an inventory search that was consistent with the policy in exhibit B. However, the policy was not read into the record nor introduced into evidence as an exhibit.

¶ 15    Deputy Gallentine testified that his search was consistent with the way other deputies do the inventory search and the way he had been trained to do it as a new deputy. He acknowledged the search was also consistent with the unwritten policies and procedures he had a habit of performing and had seen other deputies doing as the inventory. On cross-examination by the State, Deputy Gallentine testified that he did not see the purse removed from defendant. Deputy Gallentine did not see the purse until it was on the rear of the vehicle.

¶ 16    On redirect, defense counsel asked Deputy Gallentine why the purse did not go to the hospital with defendant in the ambulance. Deputy Gallentine responded that "it was cut off her person and after that she was loaded up." When the purse "arrived on the back of the vehicle, she was already gone." "At that point we are not going to leave something that could have valuable items inside of a car that's going to be towed ***."

5

¶ 17    The State called Captain Justin Varvel. Captain Varvel was the first to arrive at the scene. Defendant "had been extricated from the vehicle by some bystanders" and "was laying in the ditch 15 to 20 feet from the car." EMS had not yet arrived, and Captain Varvel observed that defendant was in "[v]ery serious" condition. Approximately five minutes later, EMS arrived and began treating defendant on the ground. Captain Varvel "assisted them as they needed it."

¶ 18    Captain Varvel testified that defendant wore a purse "strapped across her chest." Captain Varvel came into possession of the purse when the paramedics "cut [the purse] off" and "handed it to" Captain Varvel. Captain Varvel handed the purse to Sergeant Pasquale. Captain Varvel did not know what Sergeant Pasquale subsequently did with the purse. Captain Varvel did not investigate the scene "as a criminal investigation."

¶ 19    The State next called Sergeant Tye Pasquale. Sergeant Pasquale testified that he arrived at the scene of the accident after Captain Varvel. Sergeant Pasquale testified that Captain Varvel handed him a purse that was taken off the defendant, who was being treated by medical personnel. Sergeant Pasquale did not observe medical personnel remove the purse. Sergeant Pasquale placed the purse on the trunk of the vehicle while defendant was being treated.

¶ 20    Defense counsel argued that while law enforcement may have permissibly seized the purse, it was unlawful to search the purse where defendant was not arrested at the time. Defense counsel argued "there was no reason for them to search the purse without a warrant if there was a need to search the purse." Defense counsel argued that the inventory exception did not apply, where the inventory "is not an independent legal concept but rather an incidental administrative step following arrest and preceding incarceration." Moreover, defense counsel argued that there was "no issue of protecting the police" when searching the purse. Defense counsel noted that law enforcement "wanted to protect themselves from claims of loss"; however, defense counsel

6

contended that the law states "that this isn't a good enough reason to do an inventory on a person's property without a warrant." Rather, defense counsel argued that police should have "tape[d] up the item, put it in storage, that is sufficient to protect the property."

¶ 21    The State responded and argued that this case revolves around "a safekeeping of the property." The State argued: "The officers in this case were not operating as law enforcement investigating a crime, they were operating under their caretaking and community assistance functions. Those have totally different standards than an arrest and search subsequent to that arrest, seizure of property subsequent to that arrest." Essentially, the State argued that the community caretaking exception controlled.

¶ 22    Following arguments from the parties, the trial court noted that "this was not a criminal investigaton." Rather, the court noted that the officer "came into possession of the purse more as a caretaking situation." However, the court noted that there was "certainly" a search of the purse. Thus, the court considered whether the search was reasonable.

¶ 23    The trial court noted that "there could only be three reasons for the search." First, the protection of the police against claims of stolen property. Second, protection of the owner's property. Third, protection of the police from potential danger. The court noted that the testimony established that only the first two reasons were at issue in this case, where there did not seem to be concern about potential dangers.

¶ 24    The trial court continued that the officer acted in good faith, but the court stated that good faith was not relevant to whether the search was reasonable. Rather, the court considered whether less intrusive options were available to protect the owner's property and the police from claims of stolen or lost property. The court then noted that the officer could have locked the purse in the trunk of the squad car. The court added that the purse could have been placed in a sealed evidence

7

bag and returned to defendant at the hospital. Therefore, the court determined that there were "lots of less intrusive options available to the officer than searching her purse for every little item inside of it to inventory." As such, the court determined that the search was not reasonable, and therefore granted defendant's motion to suppress.

¶ 25    On August 10, 2023, the State filed a motion to reconsider. The State argued that the community caretaking exception permitted the search. On August 16, 2023, the trial court held a hearing on the motion. After considering the arguments of the parties, the court noted that the case presented a unique set of facts, and "to some extent, some discretion on the part of the officers how to treat each individual circumstance." The court determined that the officer was not "trying to violate the defendant's rights," but rather, he followed "what he thought was the proper procedure." The court determined that the search of the purse was "not part of an investigation." Rather, the officer "took the purse solely because" defendant went to the hospital "and the purse was being left behind." Thus, the officer's possession of the purse "had nothing to do with his further investigation of a crime."

¶ 26    Turning to the inventory search, the trial court noted that the officer stated that his purpose for searching the purse "was so he could inventory it so that there couldn't be some accusation of theft after the fact." However, the court noted that "it really accomplished nothing to inventory the purse as far as what he stated his stated purpose was." Rather, the court noted that the officer should have put the purse in the trunk, sealed it in an evidence bag, and taken it to the hospital.

¶ 27    Turning to reasonableness, the trial court noted that there was "a policy" but the policy "by itself" does not "make it reasonable." Rather, there were "reasonable, less intrusive route[s] he could have taken." Therefore, the court suppressed the evidence and denied the motion to reconsider.

¶ 28    On August 17, 2023, the State filed a timely notice of appeal.

¶ 29                                    II. ANALYSIS

¶ 30    On appeal, the State argues that Deputy Gallentine's warrantless search of defendant's purse was conducted in good faith pursuant to established department policy and was therefore valid under the inventory search exception to the fourth amendment's warrant requirement. Defendant responds, contending that the trial court properly granted defendant's motion to suppress evidence, because the State failed to establish that Deputy Gallentine performed a valid inventory search of her purse before returning it to her at the hospital. For the reasons that follow, we agree with defendant and affirm.

¶ 31    When reviewing a circuit court's ruling on a motion to suppress evidence, this court applies a two-part standard of review. *People v. Grant*, 2013 IL 112734, ¶ 12. This court accords "great deference" to the circuit court's factual findings, reversing those findings only if they are against the manifest weight of the evidence. *People v. Gipson*, 203 Ill. 2d 298, 303 (2003). A finding is against the manifest weight of the evidence only if it is unreasonable, arbitrary, or not based on the evidence presented, or if the opposite conclusion is clearly evident. *People v. Deleon*, 227 Ill. 2d 322, 332 (2008). However, "the ultimate legal question of whether suppression is warranted" is reviewed *de novo*. *Gipson*, 203 Ill. 2d at 304.

¶ 32    The fourth amendment to the United States Constitution protects individuals from unreasonable searches and seizures. U.S. Const., amend. IV. The fourth amendment applies to the states under the fourteenth amendment. *People v. Timmsen*, 2016 IL 118181, ¶ 9. Our state constitution provides similar protections. See Ill. Const. 1970, art. I, § 6. Warrantless searches are *per se* unreasonable under the fourth amendment, with a few well-delineated exceptions. *Arizona v. Gant*, 556 U.S. 332, 338 (2009); see also *Illinois v. McArthur*, 531 U.S. 326, 330 (2001)

9

(generally, a search is reasonable only if the government first obtains a warrant that is supported by probable cause).

¶ 33    The U.S. Supreme Court has held that "inventory searches are now a well-defined exception to the warrant requirement of the Fourth Amendment." *Colorado v. Bertine*, 479 U.S. 367, 371 (1987) (citing *Illinois v. Lafayette*, 462 U.S. 640, 643 (1983)). Nevertheless, the Supreme Court has assessed whether an inventory search is " 'reasonable' under the Fourth Amendment." *Id.* at 371-72. While an inventory search must be conducted pursuant to standardized police procedures, those procedures need not be in writing. *Gipson*, 203 Ill. 2d at 306. "Inventory searches can be upheld solely on an officer's unrebutted testimony that he was following standard procedures." *Id.* at 309.

¶ 34    "When a defendant files a motion to suppress evidence, he bears the burden of proof at a hearing on that motion." *People v. Brooks*, 2017 IL 121413, ¶ 22; 725 ILCS 5/114-12(b) (West 2022) ("the burden of proving that the search and seizure were unlawful shall be on the defendant"). Where the basis for the motion is an allegedly illegal search, a defendant must make a *prima facie* showing that there was a search and that it was illegal. *Brooks*, 2017 IL 121413, ¶ 22. Once the defendant makes a *prima facie* case, the burden shifts to the State to go forward with evidence to counter it. *Id.* "The ultimate burden of proof remains with the defendant, however." *People v. Cregan*, 2014 IL 113600, ¶ 23.

¶ 35    In the instant case, the defendant made a *prima facie* showing that the police obtained the evidence illegally when she demonstrated that law enforcement searched her purse without a warrant. See *id.* ¶ 26. That was enough to shift the burden to the State to go forward with evidence to prove that the search was valid because an exception to the warrant requirement applied. See *id.* ¶ 23. Based on the record before us, the State failed to meet its burden.

10

¶ 36    Following argument of the parties, the trial court expressly noted that whether the officer acted in good faith was not relevant to the ultimate conclusion of whether a search was reasonable. The court then considered whether less intrusive means were available to protect defendant's property and the police from claims of stolen or lost property. Although the trial court ultimately arrived at the correct conclusion, suppressing the evidence, the trial court engaged in an incorrect analysis to arrive there. As noted above, an inventory search must be conducted in good faith pursuant to reasonable standardized police procedures and not as a pretext for an investigatory stop. *People v. Hundley*, 156 Ill. 2d 135, 138 (1993).

¶ 37    Thus, we first consider whether the officer acted in good faith. The testimony and evidence do not suggest that the officer acted in bad faith or that his actions amounted to a ruse for a criminal investigation. Rather, the officer testified that he merely sought to protect himself, the department, and the defendant herself.

¶ 38    However, we must also consider whether the officer conducted the search according to standardized procedures. The trial court's ruling fails to consider whether the officer acted in accordance with any standardized department procedures. Rather, the court merely indicated that less intrusive means were available. However, this is not the correct standard.

¶ 39    The one thread common to all valid warrantless inventory searches is that the search was predicated on a standard police procedure. See *Colorado v. Bertine*, 479 U.S. 367 (1987); *South Dakota v. Opperman*, 428 U.S. 364 (1976); *Illinois v. Lafayette*, 462 U.S. 640 (1983). This court considered a similar issue in *People v. Lear*, 217 Ill. App. 3d 712 (1991). In *Lear*, this court considered whether the State proved it was a standard policy to make an inventory of the contents of a closed container. *Id.* at 714. There, this court held that "the State must show such a policy before an inventory search into containers found in an impounded vehicle will be upheld." *Id.* at

11

715. This court explained that it is permissible for officers to search a container "only if they are following standard police procedures that mandate the opening of such containers in every impounded vehicle." *Id.* In *Lear*, this court determined that the State failed to prove the existence of such a policy, and the court declined to presume that one existed. *Id.*

¶ 40 Similarly, here, the record does not support the State's position that the officer acted pursuant to a standardized police procedure. Deputy Gallantine testified that his search was consistent with the way that other deputies conduct inventory searches, and he testified that the search was consistent with unwritten policies and procedures. However, he failed to testify with specificity about what the written policy actually stated, and the State failed to introduce the policy into evidence. Deputy Gallantine referenced an inventory policy while discussing exhibit B. However, exhibit B is not in the record on appeal. Although there is no requirement that the State present written procedures, Deputy Gallantine's testimony was insufficient to show that he was acting in accordance with a standardized police procedure. *Gipson*, 203 Ill. 2d at 306, 309; *Lear*, 217 Ill. App. 3d at 714.

¶ 41 We arrive at our conclusion based upon the reasoning in *Bertine*, 479 U.S. at 374, which held that, "reasonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment, even though courts might as a matter of hindsight be able to devise equally reasonable rules requiring a different procedure." Justice Blackmun wrote separately in a special concurrence "to underscore the importance of having such inventories conducted only pursuant to standardized police procedures. The underlying rationale for allowing an inventory exception to the Fourth Amendment warrant rule is that police officers are not vested with discretion to determine the scope of the inventory search." *Id.* at 376 (Blackmun, J., concurring, joined by Powell and O'Connor, JJ.).

12

¶ 42    At issue in the case before us is that seemingly, a policy of some sort exists. Deputy Gallantine referenced an inventory policy while discussing exhibit B. There was testimony related to exhibit B, although it is impossible to glean the substance of the policy from the testimony provided. Finally, exhibit B is not in the record on appeal. The State, as the appellant, has the burden of presenting a sufficiently complete record to support its argument or claim of error on appeal. See *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391 (1984). "Any doubts which may arise from the incompleteness of the record will be resolved against the appellant." *Id.* at 392. Although there is no requirement that the State present written procedures, Deputy Gallantine's testimony was insufficient to show that he was acting in accordance with a standardized police procedure. *Gipson*, 203 Ill. 2d at 306; *Lear*, 217 Ill. App. 3d at 714. His testimony referred to his custom and habit, learned from watching other deputies.

¶ 43    The dissent contends that Deputy Gallentine's search fell within the community caretaking exception to the warrant requirement. The dissent suggests that Deputy Gallentine offered assistance and aid following the motor vehicle accident. However, here, any community caretaking function that Deputy Gallentine offered expired by the time he unlawfully searched defendant's purse. First responders arrived at the scene, tended to defendant, and transported her to the hospital. It was not until after defendant was no longer at the scene of the accident that Deputy Gallentine took possession of, and ultimately searched, defendant's purse. As such, Deputy Gallentine no longer engaged with defendant or her possessions in a caretaking function. Rather, as noted by the dissent, once the purse was transported to the police station, an inventory search was conducted. As noted above, this was improper.

¶ 44    In conclusion, the record is devoid of evidence that the inventory was conducted pursuant to a standardized policy. Deputy Gallantine could not elaborate on any policy, written or unwritten,

13

that applied to a standardized inventory search of the purse. Therefore, the State failed to meet its burden of proof that the search was reasonable. As such, we affirm the trial court's grant of defendant's motion to suppress.

¶ 45                                      III. CONCLUSION

¶ 46    Accordingly, we affirm the Vermilion County circuit court's grant of defendant's motion to suppress.

¶ 47    Affirmed.

¶ 48    JUSTICE BARBERIS, dissenting:

¶ 49    I agree with the majority that defendant made a *prima facie* showing that law enforcement conducted a warrantless search of defendant's purse and that the burden shifted to the State to prove that the search was valid under an exception to the warrant requirement. However, I disagree with the majority's determination that the State failed to meet its burden.

¶ 50    As the majority correctly notes, the State had to prove that the inventory search was conducted in good faith pursuant to reasonable standardized police procedures and not as a pretext for an investigatory search. *Hundley*, 156 Ill. 2d at 138. Here, as the circuit court found, there was simply no evidence indicating that law enforcement acted in bad faith in conducting the inventory search in the present case. The majority agrees with the court's finding in this regard. The undisputed testimony presented at the hearing indicated that law enforcement took possession of defendant's purse after it was cut off her body as emergency personnel performed necessary medical treatment on defendant following the motor vehicle collision. The testimony demonstrated that after defendant was transported to the hospital, law enforcement placed defendant's purse in

14

the trunk of a squad car and took the purse to the police station where it was inventoried. Accordingly, I agree with the majority's conclusion that law enforcement did not act in bad faith in conducting the inventory search.

¶ 51    I depart from the majority, however, in its finding that the State failed to prove that law enforcement conducted the inventory search according to standardized procedures. As the majority notes, the common thread to all valid, warrantless inventory searches is that the search was predicated on a standard police procedure. See *Bertine*, 479 U.S. 367; *Opperman*, 428 U.S. 364; *Lafayette*, 462 U.S. 640.

¶ 52    The testimony demonstrated that Deputy Gallentine obtained possession of the purse after defendant was transported to the hospital. Rather than leaving the purse at the scene of the accident, Deputy Gallentine placed the purse in the trunk of his patrol vehicle. Deputy Gallentine explained that "we," meaning law enforcement, "don't put things that could have value in them in a car that's going to be towed, it's a liability for us and for the tow company and the person *** and once I got back to the Public Safety Building, that's when I did a full inventory of it so I could log all of it." Deputy Gallentine reiterated that he inventoried the purse because it was "a liability for us if we don't, and for her." Deputy Gallentine elaborated that the "policy states that we do a full property inventory, that way everything can be logged, what's inside, what's not. That way we can't be held accountable." While the actual written policy was identified in court, it was not introduced into evidence.

¶ 53    Despite this, it is my view that Deputy Gallentine's testimony was sufficient to demonstrate that law enforcement conducted the inventory search according to standardized police procedures. That is, Deputy Gallentine transported the purse to the police station where he conducted an itemized inventory to log the contents of the purse to prevent an accusation of theft or damage to

15

property. Deputy Gallentine testified that his inventory search was consistent with the procedures, both written and unwritten, of other deputies. Moreover, there was no evidence indicating that Deputy Gallentine's action did not comport with standardized procedures. Thus, unlike the majority, I would find that the State presented sufficient evidence to establish that law enforcement conducted the inventory search according to standardized procedures.

¶ 54    Accordingly, I would find that the State proved the inventory search was conducted in good faith pursuant to reasonable standardized police procedures and not as a pretext for an investigatory search. Therefore, I would reverse the circuit court's order granting defendant's motion to suppress evidence for that reason and remand for further proceedings.

¶ 55    In addition, I would find that the evidence demonstrated that Deputy Gallentine's search fell within the community caretaking exception to the warrant requirement. As our supreme court explained in *People v. McDonough*, 239 Ill. 2d 260, 268-69 (2010):

"The United States Supreme Court first set forth the community caretaking exception in *Cady v. Dombrowski*, 413 U.S. 433, 37 L. Ed. 2d 706, 93 S. Ct. 2523 (1973). The Court explained that local law enforcement officers 'frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.' [Citation.] Rather than describing a tier of police-citizen encounters, community caretaking refers to a capacity in which the police act when they are performing some task unrelated to the investigation of crime, such as helping children find their parents, mediating noise disputes, responding to calls about missing persons or sick neighbors, or helping inebriates find their way home. Courts use the term 'community caretaking' to uphold searches or

16

seizures as reasonable under the fourth amendment when police are performing some function other than investigating the violation of a criminal statute. Community caretaking describes an exception to the warrant requirement. [Citation.]"

¶ 56 Here, it is undisputed that law enforcement was performing some function other than the investigation of a crime when the search occurred. See *McDonough*, 239 Ill. 2d at 272 (law enforcement must be performing some function other than investigating a crime for the community caretaking exception to apply). The evidence demonstrated that law enforcement was offering genuine assistance and aid following a motor vehicle collision—assistance that is welcomed by individuals in distress, as well as emergency medical responders, following a motor vehicle collision. In addition, the inventory search was reasonable because it was undertaken to protect the safety of the general public. See *id.* ("the search or seizure must be reasonable because it was undertaken to protect the safety of the general public"). The evidence demonstrated that law enforcement came into possession of defendant's purse after it was cut from her person while she was receiving emergency medical treatment. Law enforcement transported the purse to the police station where an inventory search was conducted in accordance with standardized police procedures. These procedures were in place to, *inter alia*, protect the safety of the general public, as well as the police officers, conducting the search. Inventory searches protect law enforcement officers and the individuals who own the property in that any dangerous items will be discovered and handled properly and any accusations of theft or damage are prevented. These policies protect the safety of the general public. Thus, I would find that there was no fourth amendment violation and hold that the exclusionary rule would not apply in this case.