506 S.E.2d 358

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Paul D. YORK, Defendant Below, Appellant.**

**No. 24477.**

Supreme Court of Appeals of West Virginia.

Submitted June 2, 1998.

Decided July 14, 1998.

---

Joseph C. Cometti, Charleston, for Appellant.

Darrell V. McGraw, Attorney General, Rory L. Perry, II, Assistant Attorney General, Charleston, for Appellee.

## PER CURIAM: [1]

A jury found the appellant in this proceeding, Paul D. York, guilty of daytime burglary in violation of W.Va.Code 61–3–11, and the Circuit Court of Clay County sentenced him to from 1–10 years in the State Penitentiary.[2] On appeal, Mr. York claims, among other things, that the circuit court improperly failed to suppress the admission of evidence obtained during a search of the trunk of the vehicle which he was driving immediately prior to his arrest.

## I.

## BACKGROUND FACTS

On June 26, 1996, Gene King, who was the Chief of Police for the Town of Clay, West Virginia, observed the appellant, who was driving a white Ford Fairmont with a temporary Kentucky license tag, veer to the left across a double yellow line to pass a car which had slowed to make a right-hand turn. Chief King immediately pursued the appellant and pulled him over about four blocks away. The appellant stopped approximately two and one-half feet from the curb in front of a private residence on Route 16, the main road through Clay, West Virginia.

When Chief King asked to see the appellant's driver's license, the appellant, who was not a West Virginia resident, said that he had left the license with his wife at a motel room in Charleston, West Virginia. Shortly thereafter, he changed his story and stated that he had recently allowed his license to expire.

Chief King made a dispatch inquiry concerning the appellant, and that inquiry showed that the appellant's Georgia driver's license had expired in 1990. Upon learning

1. We point out that a per curiam opinion is not legal precedent. *See Lieving v. Hadley*, 188 W.Va. 197, 201 n. 4, 423 S.E.2d 600, 604 n. 4 (1992).

2. W.Va.Code 61–3–11, provides, in relevant part:
   (b) If any person shall, in the daytime, enter without breaking a dwelling house, or an outhouse adjoining thereto or occupied therewith, of another, with intent to commit a crime therein, he shall be deemed guilty of a felony, and, upon conviction, shall be confined in the penitentiary not less than one nor more than ten years.

this, Chief King decided to arrest the appellant and impound his vehicle. Chief King, therefore, immediately ordered that the dispatcher send a tow truck to tow the appellant's car for the impoundment. He then notified the appellant that he was under arrest and that the vehicle was going to be impounded.

Upon learning that the vehicle was going to be impounded, the appellant protested and stated that the vehicle belonged to his father who lived in Kentucky. Chief King nonetheless stated that it was his obligation to tow the vehicle and get it off the street.

The driver's side door of the vehicle was open, and a deputy who had appeared on the scene, noticed two small jewelry or "locket" boxes on the floor of the driver's side of the vehicle. The boxes contained jewelry, and independent of the discovery of these items, Chief King had determined that it was necessary to do an inventory search of the vehicle before it was towed.

During the subsequent inventory search, a number of items, including two VCRs, were discovered in the trunk of the vehicle. One of the VCR's had a white repair tag attached to it that contained the name and number of John Ramsey, who was an inhabitant of the town of Clay. Chief King was familiar with Mr. Ramsey and contacted him about the VCR. Mr. Ramsey shortly thereafter arrived at the scene and identified the VCR and told the authorities that it had been in his house that morning when he had left for work. Later that day, Mr. Ramsey learned that his house had been broken into and that his VCR had been stolen.

The appellant was subsequently indicted for daytime burglary in violation of West Virginia Code § 61–3–11.

Prior to the appellant's trial, his attorney moved to suppress the various items seized by the police during the inventory search, including Mr. Ramsey's VCR. A suppression hearing was subsequently held, and at that hearing, the trial judge ruled that the appellant had the burden of proof and the burden of going forward with the evidence. At the conclusion of the hearing, the court ruled that the initial stop of the appellant's vehicle

was proper and that the offense of driving without a valid operator's license gave Chief King reasonable cause to arrest the appellant. The court also ruled that there was no reasonable alternative to impoundment of the vehicle since allowing it to remain where it was parked could have constituted a danger to the public who were using the highway. Additionally, the court ruled that the inventory search conducted pursuant to the impoundment was necessary to protect the appellant's property and protect the police from false claims. Since the search was appropriate, the court concluded that the discovery and seizure of Mr. Ramsey's VCR was lawful. The court, therefore, denied the motion to suppress the admission of the VCR into evidence.

The appellant's actual trial commenced on August 5, 1996. At that trial, John Ramsey testified that on the morning of June 26, 1996, he read the clock on his VCR as he was about to leave his home for a trip to Summersville. He also testified that sometime that afternoon, he was contacted and taken to the scene of the appellant's traffic stop in Clay, West Virginia. At the scene, Mr. Ramsey identified his VCR, and when he returned home, he saw that his back door had been kicked in.

During the trial, evidence was also introduced relating to the stop of the appellant, as well as the search which resulted in the discovery of the VCR. Finally, the VCR itself was introduced into evidence. The appellant chose not to testify, and the defense presented no witnesses. As previously indicated, at the conclusion of the trial, the jury returned a verdict of guilty.

After the jury returned its verdict, the appellant filed post-trial motions in which he claimed, among other things, that the trial court had erred in imposing upon him the burden of proof and burden of going forward with the evidence during the suppression hearing. He also claimed that the search of his vehicle had been conducted in violation of his constitutional rights and that the trial court had erred in refusing to suppress the admission of the VCR which had been discovered during that search.

At the conclusion of the hearing on the post-trial motions, the trial court concluded that the appellant had, in fact, been erroneously charged with the burden of proof and the burden of going forward with the evidence at the suppression hearing. The court, therefore, ordered that the appellant be provided with a new suppression hearing. The court denied the other motions made by the appellant.

A second suppression hearing was conducted on January 23, 1997. At that second suppression hearing, Chief King explained that inventory searches were routinely conducted of impounded vehicles, and he suggested that he always conducted inventory searches when he impounded vehicles. He also suggested that such searches were necessary to protect the police and political subdivision from false claims relating to missing personal property. Additional evidence basically proceeded along the lines of the evidence adduced at the first suppression hearing.

During the suppression hearing, the appellant argued that he could have made other arrangements for the security of his vehicle prior to the impoundment and that under such circumstances the impoundment was unreasonable.

At the conclusion of the second suppression hearing, the trial court again ruled that the appellant was arrested and the court also concluded that the chief of police's decision to impound the vehicle was proper since there was no reasonable alternative to impoundment. Finally, the court ruled that the inventory search in the case was not pretextual and was conducted for the legitimate public purpose of protecting both the officer and the political subdivision for which the officer was employed from potential liability. The court accordingly denied the motion to suppress and declined to set aside the jury's verdict of guilty.

As previously indicated, in the present appeal, the appellant claims that the circuit court erred in refusing to suppress the evidence seized during the search.

## II.

### BURDEN OF PROOF

This Court has held that a trial court's legal conclusions regarding the suppression of evidence seized in a search and seizure situation are reviewed *de novo*, while factual determination involving those legal conclusions are reviewed under a clearly erroneous standard. *State v. Buzzard*, 194 W.Va. 544, 461 S.E.2d 50 (1995). *See also, State v. Lacy*, 196 W.Va. 104, 468 S.E.2d 719 (1996).

## III.

### DISCUSSION

As previously stated, the appellant in the present proceeding claims that the trial court erred in refusing to suppress the admission of evidence obtained during the search of the trunk of the vehicle which he was driving. The record rather clearly shows that this search was a warrantless search conducted pursuant to the so-called "inventory search" exception to the general rule that a properly-obtained search warrant is constitutionally required for the valid search of private areas of a vehicle such as the one involved in this case.

In *State v. Goff*, 166 W.Va. 47, 272 S.E.2d 457 (1980), this Court discussed at some length the prerequisites of the "inventory search" exception. The Court indicated that for a search to be constitutionally sustainable under the "inventory exception":

(1) [T]here was an initial lawful impoundment of the vehicle;

(2) the driver was not present at the time of the impoundment to make other arrangements for the safekeeping of his belongings;

(3) the inventory itself was prompted by a number of valuables in plain view inside the car; and

(4) there was no suggestion that the inventory search was a pretext for conducting an investigative search.

*State v. Goff*, 166 W.Va. at 49, 272 S.E.2d at 460.

The Court believes that the "inventory search" in the present case fails on each of these four points.

■ As stated in *State v. Goff, id.,* the first prerequisite to a valid inventory search is an initial lawful impoundment of a vehicle. This requirement was specifically set forth in Syllabus Point 1 of *State v. Goff, id.,* as follows: "The right to an inventory search begins at the point where the police have a lawful right to impound the vehicle."

In the later case of *State v. Perry,* 174 W.Va. 212, 324 S.E.2d 354(1984), the Court discussed what is necessary for there to be a lawful impoundment. One critical prerequisite is that the police have "reasonable cause" for impounding the vehicle. The Court proceeded to define "reasonable cause" by quoting with approval *State v. Singleton,* 9 Wash. App. 327, 332–33, 511 P.2d 1396, 1399–1400 (1973), which states:

> "Reasonable cause for impoundment may, for example, include the necessity for removing (1) an unattended-to car illegally parked or otherwise obstructing traffic; (2) an unattended-to car from the scene of an accident when the driver is physically or mentally incapable of deciding upon steps to be taken to deal with his property, as in the case of the intoxicated, mentally incapacitated or seriously injured driver; (3) a car that has been stolen or used in the commission of a crime when its retention as evidence is necessary; (4) an abandoned car; (5) a car so mechanically defective as to be a menace to others using the public highway; (6) a car impoundable pursuant to ordinance or statute which provides therefor as in the case of forfeiture."

*State v. Perry,* 174 W.Va. at 216, 324 S.E.2d at 358.

■ In the present case the State argued, and the circuit court concluded, that, following the appellant's arrest, his vehicle was, or was potentially, an unattended-to car obstructing traffic. It is clear that the other five causes do not apply.

Although at one point Chief King testified that the appellant's vehicle was impounded because it was obstructing traffic, elsewhere in his testimony, he clearly and repeatedly stated that the reason he ordered the towing or the impounding of the vehicle was because he suspected that the appellant had engaged in criminal activity. His testimony proceeded as follows:

Q  Okay. Now, with regard to the vehicle being towed, why—why did you make a decision to tow this vehicle?

A  The decision to tow that vehicle: he didn't know where he was at. He hadn't been in this territory. He had just passed a police officer in broad view and didn't stop and ask for directions, proceeded on around this lady in town that had put her turn signal. And he had already misled me about his operator's license, and the temporary tags on the car. And a place such as this, you recognize a stranger or local citizen, and so forth, and that's one of the reasons I even handcuffed him; I did not know him. He was an unlicensed operator; and he had a vehicle with out-of-state with an old temporary tag up in the back glass.

Later, Chief King expanded upon this in the following testimony:

Q  All right. The only thing I'm asking you is, what did all of these things that you testified to make you suspicious of? Did it make you suspicious that he, perhaps, was a law breaker of some sort; that he was a fugitive of some sort; or that he was a troublemaker of some sort? Did all of these things that we've covered here so far during my questioning—

A  Yes.

Q  —make you suspicious that this man was in some way a criminal?

A  Yes. Why wouldn't they?

Q  Okay. All right.

A  Yes, sir.

Q  Let me back up. At what point did you first become suspicious of the fact that Mr. York might be in some way a criminal or that he might be up to something?

A  Well, the first point I can't say, but it was he had lied about his operators, which they had expired in 1990; this was in 1996. You'd passed—you're wanting help. We're a small town, the streets are narrow. And you're lost—you don't know

where you're at—the first time in this area—there sets a police officer—you didn't slow down or put on taillights and back up, or pull off real quick and wait, and say, "Where am I at? Can you help me?" This adds to it, sir. Yes, sir, it does.

Based on this evidence this Court can only conclude that Chief King was primarily motivated to impound the appellant's vehicle because he suspected that the appellant had engaged in criminal activity. This becomes more apparent in light of the testimony of Chief King that the obstruction of traffic was relatively minor and could apparently have been corrected by parking the vehicle a little closer to the curb:

Q Okay. I want to take you back just a little bit to, you said when you first pulled the vehicle over it was approximately two and a half feet from the curb. Was it out in the street, out in the portion that's driven on by the public?

A It wasn't no big deal if the traffic was all going south, but the northbound traffic, it was—they'd a had to veered over acrossed and take more of their highway if two was passing there, cause, you know, your streets are just, you know, of course, just so wide, you know. And it should have been a couple of feet or two and a half closer to the sidewalk than what it was because of the traffic.

In light of all this, this Court believes that the trial court was clearly wrong in holding that the impoundment was reasonable.

■ Even if the impoundment were proper, as pointed out previously, *State v. Goff,* *supra,* indicates that for an inventory search to be proper, the taking of the inventory itself must be prompted by a number of valuables in plain view inside the car, and there must be no suggestion that the inventory search was a pretext for conducting an investigative search. It is clear from Chief King's testimony that he suspected that the appellant had committed a crime other than the minor traffic violation for which he was stopped. It is also clear that he was not motivated to conduct the search by the valuables in plain view inside the appellant's car,

for at the suppression hearing he testified as follows:

Q ... Now, let me ask you this: When did you make the decision to conduct this search? In this whole flow of events that we're talking about here, that I apologize to you, we're going into in real minute detail. When during this flow or sequence of events did you make the decision to make this search?

A I don't think you quite heard the statement, sir. And .I apologize if you misunderstood me. An inventory search and a search is altogether different in the sight of the law. Even if I hadn't saw nothing in the front end of the car, an inventory search would have been completed on the car's content; inside, plus sometimes—nine this month that I've had towed, that went to the graveyards and wrecker shop—people don't come and claim them. If they'd been no keys in the vehicle—and sometimes you don't need the key; your switch will work without a key in the switch. But I would have inventoried what was in—I could get to in that vehicle before it was towed, for my own protection. But the key was in the switch. Then, when Officer Holcomb was there with me also. I would have done it without Officer Holcomb. It's my job. But I would have taken the key and inventoried for spare tires, and jacks, and tools, in the trunk before the car would have been towed.

\* \* \* \* \* \*

Q So, what you're telling us is that you were going to do the inventory search. And we all agree, that this was an inventory search; right? This was an inventory search?

A That's what I stated, sir.

Q Right. Okay. You had decided to do the inventory search just as part of your routine of having the vehicle impounded; correct?

A Yes.

Q Okay. So, in other words, as you just stated, the fact that you found a locket box—or that Deputy Holcomb found the locket box on the floor of the vehicle un-

derneath the gas peddle, or near the gas peddle, had nothing to do with your decision to conduct the inventory search; correct? You had already made that decision; right?

A I would have inventoried the vehicle and its contents.

Q Even—let me—let me ask it again, cause I'm not sure if I'm making myself clear to you and I want to get a good clear record here. You would have conducted the inventory search regardless of whether or not you or Deputy Holcomb would have found those locket boxes in the front seat of the car.

A I would have inventoried the vehicle. It wouldn't make a darn what was in the floor or laying in the seat, I would have inventoried, the same procedures, the vehicle before it left my sight and went to the tow shop.

Q Okay. Is that your standard procedure?

A Yes, it is.

Finally, even though not essential to the decision in this case, the Court, in *State v. Perry, supra,* recognized that when a driver of a vehicle has been arrested in or near his car, he must ordinarily be given an opportunity to make arrangements for disposition of it himself before it is impounded. Specifically, the Court held in Syllabus Point 2 of *State v. Perry, supra,* that:

There is no need to confer with the owner or possessor of a car prior to impoundment concerning the disposition of his vehicle and its contents where he is unavailable or physically or mentally incapable of making

arrangements for its protection or the vehicle has been stolen or has been used in the commission of a crime and its retention as evidence is necessary. However, in the situation where the owner or possessor of a vehicle has been arrested in or near his car, ordinarily, he must be given a reasonable opportunity to make some alternative disposition of the vehicle before the police may impound it for the sole purpose of protecting it and its contents from theft or damage.

In the present case, the State suggests that an alternative disposition of the appellant's vehicle would have required the presence of the appellant's wife or father and that they were many miles away and that it would have taken an unduly long time for them to arrive in Clay. While this facially seems to be a valid argument, Chief King's testimony indicates that he made a decision to impound the vehicle even before he arrested the appellant and even before he had discussed alternative dispositions of the vehicle. Further, as previously indicated, the testimony of Chief King suggests that any traffic problem caused by the vehicle could have been cured by parking it slightly closer to the curb, an alternative disposition which the police could have made with little difficulty. The fact that this might have been a reasonable disposition is buttressed by testimony that a magistrate's office was an eight or ten minute walk from the location of the vehicle. The appellant was charged with a misdemeanor traffic violation which could have been handled by the magistrate in a short period.[3]

---

3. This Court notes that in *Colorado v. Bertine,* 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987), the Supreme Court of the United States indicated that the Federal Constitution did not always require that the police afford a stopped individual an opportunity to make an alternative disposition of his vehicle.

This Court and the Supreme Court of the United States have both recognized that while a state may not interpret its constitutional guarantee which is identical to a federal constitutional guarantee in a manner more restrictive than the Supreme Court of the United States, nothing prevents a state court from equaling or exceeding the federal standard. *Adkins v. Leverette,* 161 W.Va. 14, 239 S.E.2d 496 (1977); *Oregon v. Hass,* 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d

570 (1975); *Sibron v. New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968).

In *State v. Goff,* 166 W.Va. 47, 272 S.E.2d 457 (1980), Justice Miller recognized that the case of *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), the then-lead case on inventory searches, perhaps did not go as far in protecting a defendant's rights as did the Court in *Goff.* Justice Miller said:

While it may be argued that these conditions are not an integral part of the *Opperman* holding, we consider them to be. Even if they are not required by the Fourth Amendment, they comport with our view of the prerequisites of an inventory search under Article III, Section 6 of the West Virginia Constitution.

For the reasons stated, this Court believes that the search of the trunk of the appellant's vehicle was improper under the "inventory search" exception and that the trial court erred in failing to suppress the evidence seized as a result of that search. The Court also concludes that the judgment of the Circuit Court of Clay County should be reversed and the defendant's conviction set aside.[4]

Reversed and conviction set aside.

---

*State v. Goff,* 166 W.Va. at 49, 272 S.E.2d at 460 (1980).

The Court also emphasized in *State v. Perry,* 174 W.Va. 212, 324 S.E.2d 354 (1984), that that decision was based on our interpretation of our constitution provision:

In this case, we find that the arresting officer did not have a ground for impoundment that would enable him to avoid giving the driver a reasonable opportunity to make an alternative disposition. The failure to permit such alternative disposition renders the impoundment and subsequent inventory search invalid. We specifically base this requirement, as we did in *Goff,* on Section 6 of Article III of the West Virginia Constitution.

*State v. Perry,* 174 W.Va. at 218, 324 S.E.2d at 360.

In light of the fact that we have based our decision in the present case on factors other than the failure of the police department to afford the appellant an opportunity to make an alternative disposition of his vehicle, and in light of the fact that our inventory search rule is more expansive than the federal rule, the Court does not believe that the decision in *Colorado v. Bertine,* alters the outcome of this case.

4. In addition to challenging the search in this case, the appellant claims that his attorney rendered ineffective assistance of counsel, that there were defects in the jury selection process, and that the jury was prejudiced when it was allowed to see him shackled and otherwise restrained. These assignments all relate to events that occurred during trial and will not necessarily recur during a possible retrial. We have law discussing the problems raised, and because the resolution of these issues is unnecessary to the decision of this case, the Court believes that a redundant recitation of the law on the points is unnecessary.