[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-15840

_____

D.C. Docket No. 3:10-cr-00298-HLA-TEM-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

AKINTUNDE AKINLADE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(May 22, 2013)

Before PRYOR and JORDAN, Circuit Judges, and PRO,[*] District Judge.

PER CURIAM:

Akintunde Akinlade appeals his convictions for conspiracy to commit

aggravated identity theft, in violation of 18 U.S.C. § 371; bank fraud, in violation

_____

[*] Honorable Philip M. Pro, United States District Judge for the District of Nevada, sitting by
designation.

of 18 U.S.C. § 1344; mail fraud, in violation of 18 U.S.C. § 1341; access device fraud, in violation of 18 U.S.C. §§ 1029(a)(5), 1029(c)(1); and aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1).  Having reviewed the record, and with the benefit of oral argument, we affirm.

## I.    BACKGROUND

In early 2010, United States Postal Inspector Adam Schaefer issued a BOLO crime alert flyer for an unidentified male suspected of bank fraud.[1]  The BOLO contained surveillance photographs of the suspect; a description of the suspect (including his approximate height, build, and age range); the crimes allegedly committed; the vehicle the suspect was believed to be driving, including its license plate number; and surveillance photographs of the vehicle.  *See* Crime Alert Flyer (Govt. Ex. 1 at Suppression Hearing).  On March 12, 2010, Keenan Haines—the manager at Flagstar Bank, in Duluth, Georgia—called Inspector Schaefer to report that a person resembling the subject of the BOLO had been in his bank and attempted to open both personal and business accounts under the name "John Paul Mozingo."  Pursuant to Inspector Schaefer's advice, bank employees contacted the local police department.

Officer A.M. Kelley received a dispatch advising her that a male with active warrants for identity fraud was believed to be at the bank.  Upon her arrival, she

---

[1] "BOLO" is an abbreviation for "be on the lookout for."  This BOLO had been disseminated to law enforcement agencies and financial institutions in the southeastern United States.

2

was shown the BOLO and some paperwork that "Mr. Mozingo" had completed to open the bank accounts. She observed "Mr. Mozingo," who was seated in Mr. Haines' office, and after comparing him to the photograph in the BOLO, she concluded that he was "extremely similar" to the man in the photo. *See* Transcript of Suppression Hearing at 10 [D.E. 55]. Officer Justin Von Behren also arrived at the bank and after Officer Kelley showed him the BOLO, he too agreed that "Mr. Mozingo" matched the description of the subject.

The two officers entered Mr. Haines' office and asked "Mr. Mozingo" if he would allow a pat down for officer safety, a request to which he agreed. Officer Kelley noticed that he became "very fidgety" during the pat down and would not stay still. "Mr. Mozingo" asked if he was under arrest and Officer Kelley responded that he was not under arrest, but was being detained for further investigation. When Officer Von Behren pulled out his handcuffs, "Mr. Mozingo" stepped away and headed for the door. The officers tried to stop him but he resisted and the three of them ended up fighting in the bank lobby. In an effort to subdue him, Officer Kelley pulled out her Taser and deployed it. She fired once, hitting "Mr. Mozingo." Although "Mr. Mozingo" fell to the ground, he was not completely subdued, and continued to crawl toward the exit, kicking Officer Von Behren in the process. Officer Kelley fired her Taser again and tried to handcuff "Mr. Mozingo," who was still resisting and fighting his way outside the bank.

3

The officers were eventually able to handcuff "Mr. Mozingo" with the aid of additional officers, and placed him in Officer Kelley's patrol vehicle. When Officer Kelley asked "Mr. Mozingo" for his name, he said that it was "Peter Akinlade." Officer Kelley did not read him *Miranda* warnings, nor was she aware that any other officer read him any such warnings. While in the backseat of her patrol vehicle, he asked her how much trouble he was in. She told him that he was being charged with two counts of obstruction of a police officer and that other jurisdictions were looking for him and would possibly charge him with financial identity fraud. In response, he said "I'm screwed." After he requested that Officer Kelley call his mom and refer to him as "Mike," she said "you seem to have a lot of names," to which he responded, "Yeah, I've gone by several names." "Mr. Mozingo" was later identified as Akintunde Akinlade.

Officer Von Behren stayed at the scene and located a vehicle in the bank parking lot which matched the description of the vehicle mentioned in the BOLO, "a 2006 silver Nissan Maxima SL bearing Georgia tag #BKF8636," with a given VIN number, registered to Randy Glover, a name on "a fraudulently obtained driver's license." Officer Von Behren compared the vehicle to the information in the BOLO, and ran the license plate number through dispatch. When dispatch indicated that the vehicle was registered to Randy Glover, Officer Von Behren determined that this was indeed the vehicle mentioned in the BOLO. He decided

4

to impound the vehicle; he completed the police department impound form and inventoried the contents of the vehicle pursuant to standard procedure.

All this information was relayed to Inspector Schaefer, who prepared an affidavit and application for a search warrant of the vehicle, which was granted by a magistrate judge in the Northern District of Georgia. Pursuant to the search, Inspector Schaefer found cellular phones, computer thumb drives, and a laptop computer. Inspector Schaefer obtained an additional search warrant to search the contents of the electronic devices, thereby uncovering more incriminating evidence, including evidence of identity theft.

Mr. Akinlade was indicted by a federal grand jury in the Middle District of Florida on one count of conspiracy to commit aggravated identity theft, four counts of bank fraud, five counts of mail fraud, one count of access device fraud, and one count of aggravated identity theft. Prior to trial, he filed a motion to suppress statements he made and the evidence seized from the vehicle, arguing that they were the fruits of an unlawful stop, arrest, and search. Following a suppression hearing, the magistrate judge recommended that Mr. Akinlade's motion be denied, and the district court later adopted the report and recommendation.

At the end of the first day of trial, the district judge disclosed that two of the victim-witnesses, Jack James and Viola Walker, owned property in his neighborhood. The district judge explained that:

5

Mr. James has been a resident in that neighborhood, or he has owned a home in that neighborhood, for a very long time, but he hasn't lived there in probably 10, 15 years. I didn't even think he still owned that property. Miss Walker, I don't know what her situation is, but she lives up north, as well as in the neighborhood. So I thought I would throw that out to you.

Trial Transcript at 63 [D.E. 121]. He also added that "Viola Walker and I served on a homeowners board in that neighborhood." *Id.* Mr. Akinlade filed a motion for recusal pursuant to 28 U.S.C. § 455(a), asserting that the judge's impartiality might be in question because both witnesses were also victims in the case. *See id.* at 7-9 [D.E. 122]; Motion for Recusal [D.E. 92]. The district judge clarified that he had seen Ms. Walker two or three times, but never officially met her. He further noted that Ms. Walker spent most of her time in some other city and that since she was elected to serve on the board of property owners, he had seen her at two or three board meetings. He added that they had never been to each other's homes, that "there [was] no relationship between [them] other than being board members," and denied the motion for recusal. *See* Trial Transcript at 10-12 [D.E. 122].

The jury found Mr. Akinlade guilty of all twelve counts. The district court sentenced him to a term of 95 months' imprisonment.

On appeal, Mr. Akinlade argues that (1) the district court erred in denying the motion to suppress because the police officers lacked reasonable suspicion to detain him and probable cause to arrest him; (2) he was entitled to but was not

advised of his *Miranda* rights; (3) the search and seizure of the items found in his vehicle violated *Arizona v. Gant*, 556 U.S. 332 (2009); and (4) the district judge abused his discretion when he denied the motion for recusal.

## II.    STANDARDS OF REVIEW

We review the district court's denial of a motion to suppress evidence under a mixed standard of review. *See United States v. Jiminez*, 224 F.3d 1243, 1247 (11th Cir. 2000). "A district court's denial of a motion to suppress evidence is reviewed as a mixed question of law and fact, with the rulings of law reviewed *de novo* and the findings of fact reviewed for clear error, in the light most favorable to the prevailing party." *United States v. De La Cruz Suarez*, 601 F.3d 1202, 1213 (11th Cir. 2010). We review a district court's denial of a motion for recusal for abuse of discretion. *See United States v. Bailey*, 175 F.3d 966, 968 (11th Cir. 1999).

## III.    DISCUSSION

### A. The Stop and Arrest

The Fourth Amendment protects individuals from unreasonable government search and seizure. U.S. CONST. amend. IV. An officer may briefly detain a person if she has a reasonable and articulable suspicion based on objective facts that criminal activity is afoot. *See Terry v. Ohio*, 392 U.S. 1, 30 (1968). *See also United States v. Powell*, 222 F.3d 913, 917 (11th Cir. 2000) ("Under *Terry*, law

enforcement officers may detain a person briefly for an investigatory stop if they have a reasonable, articulable suspicion based on objective facts that the person has engaged in, or is about to engage in, criminal activity."). A determination of reasonable suspicion is based on the totality of the circumstances and may be formed even if the conduct is ambiguous or can be given an innocent explanation. *See Illinois v. Wardlow*, 528 U.S. 119, 125 (2000); *Powell*, 222 F.3d at 917-18. "[I]f a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop to check identification, to pose questions to the person, or to detain the person briefly while attempting to obtain further information." *United States v. Hensley*, 469 U.S. 221, 232 (1985) (internal citations omitted).

Here, the officers were permitted to question and briefly detain Mr. Akinlade to obtain additional information because he matched the description of the suspect in the BOLO. *See id.* The officers arrived in response to a dispatch call announcing that a male with active warrants for identity fraud was believed to be at the bank. Both officers testified that, after comparing the photograph in the BOLO to Mr. Akinlade, they believed him to be the suspect in the BOLO. Moreover, Mr. Akinlade was "fidgety" during the pat down, providing a reasonable belief that he might flee because he may have been engaged in criminal activity. *See Wardlow*,

8

528 U.S. at 124 ("Our cases have also recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion."); Transcript of Suppression Hearing at 74 (Officer Von Behren testified that Mr. Akinlade acted "fidgety" almost "from the time we came in, he became nervous and increased in nervousness as our contact continued, culminating with his attempted escape"). Under the totality of these circumstances, the officers had reasonable suspicion that Mr. Akinlade had engaged in the fraudulent identity theft scheme described in the BOLO and had the right to momentarily detain him so they could complete their investigation. *See Hensley*, 469 U.S. at 232. *See also* Transcript of Suppression Hearing at 76 (Officer Von Behren testified that the decision to detain Mr. Akinlade was based "on a number of factors," including the "information we had received at dispatch, the bolo we scanned, the pictures and then what he stated his purpose being there was," which he and Officer Kelley "believed . . . warranted further investigation").

When Mr. Akinlade attempted to leave the bank and resisted, the officers had additional reason to believe he was the suspect referenced in the BOLO. And when Mr. Akinlade actively struggled with the officers, kicking and crawling in an attempt to flee, the officers acquired probable cause to arrest him for obstruction. *See* GA. CODE ANN. § 16-10-24 ("Obstruction of Officers"); *Spence v. State*, 672

9

S.E. 2d 538, 540 (Ga. Ct. App. 2009) (holding that officer had probable cause to arrest defendant for obstruction once he fled from sergeant).

## B. The Statements

Mr. Akinlade asserts that his post-arrest statements to Officer Kelley were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966).  That contention is moot, however, because the government did not offer those statements into evidence at trial.  *See United States v. Diecidue*, 603 F.2d 535, 561 (5th Cir. 1979) ("[The Defendant] also contends that the fruits of this entire search should be suppressed because some of the items were improperly seized . . . . Since the Government did not introduce these items into evidence, the issue is moot.").[2]

## C. The Impoundment and Search of the Vehicle

Mr. Akinlade argues that the search of, and seizure of items from, his vehicle were unconstitutional.  As Mr. Akinlade sees it, he did not have access to his vehicle, as he was already arrested, and the officers did not have information that there would be evidence relating to his obstruction offense in the vehicle.  *See Arizona v. Gant*, 556 U.S. 332, 344 (2009) ("Because police could not reasonably have believed either that Gant could have accessed his car at the time of the search or that evidence of the offense for which he was arrested might have been found

---

[2] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

therein, the search in this case was unreasonable."). Mr. Akinlade also argues that the search was illegal because his vehicle was impounded in violation of the rules of the Gwinnett County Police Department. We need not address Mr. Akinlade's *Gant* argument because the impoundment and inventory of the vehicle were permissible on other grounds.

A police officer may impound and inventory a vehicle when he has acted pursuant to standard criteria or police procedures. *See Colorado v. Bertine*, 479 U.S. 367, 375-76 (1987) (holding that officer's inventory of impounded van was permissible under the Fourth Amendment because it was done according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity); *South Dakota v. Opperman*, 428 U.S. 364, 376 (1976) (holding that routine inventory search—pursuant to standard police procedures—of an automobile lawfully impounded by police for violations of municipal parking ordinances did not violate the Fourth Amendment); *United States v. Roberson*, 897 F.2d 1092, 1096-97 (11th Cir. 1990) (police officer's impoundment and inventory of car in accordance with standard police procedures was not unreasonable under the Fourth Amendment). *See also Sammons v. Taylor*, 967 F.2d 1533, 1543 (11th Cir. 1992) (qualified immunity case: "Even if an arrestee's vehicle is not impeding traffic or otherwise presenting a hazard, a law enforcement officer may impound the vehicle, so long as the decision to impound is made on the basis of standard

11

criteria and on the basis of 'something other than suspicion of evidence of criminal activity.'"). Mr. Akinlade asserts that, according to the Gwinnett County Police Department Directives Manual, if the operator of a vehicle is arrested, the officer's decision to impound the vehicle must be reasonable under the circumstances. Mr. Akinlade argues that because the vehicle was parked in the bank parking lot and there were no safety concerns with leaving the vehicle there, the decision to impound was improper. *See* Directives Manual § 427.03 (Supp. Ex. to the Suppression Hearing) [D.E. 54-1 at 1-2].

The Manual, however, also permits an officer to impound and "hold" a vehicle if "there is a question as to who the lawful owner of the vehicle is." *See* Directives Manual § 427.05. *See also United States v. Shareef*, 100 F.3d 1491, 1508 (10th Cir. 1996) (car can be impounded until ownership is determined). Here, the BOLO stated that the vehicle was registered under a fraudulently obtained driver's license and that it was unknown who the true owner might be. In addition, Mr. Akinlade had used three different names (Mr. Mozingo, Peter Akinlade, and Mike), creating more questions about the vehicle's ownership and Mr. Akinlade's relationship to the vehicle. Officer Von Behren's impoundment and inventory thus adhered to the requirement that they be conducted according to standardized criteria. *See Bertine*, 479 U.S. at 375; Directives Manual § 427.06 ("Before impound . . . [the] vehicle will be inventoried"); Transcript of

12

Suppression Hearing at 53 (Officer Von Behren testified that inventory of the contents of the vehicle was "standard procedure for any impounded vehicle"); *id.* at 67 ("Department policy requires me to inventory the contents of the vehicle to identify any items of value").

Inspector Schaefer's searches after the inventory were lawful because they were conducted pursuant to valid search warrants.  We therefore reject Mr. Akinlade's Fourth Amendment arguments.

## D. Recusal

A judge shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.  *See* 28 U.S.C. § 455(a).  The standard for recusal is whether an objective, disinterested lay observer fully informed of the facts would entertain a significant doubt about the judge's impartiality.  *See United States v. Kelly*, 888 F.2d 732, 744-45 (11th Cir. 1989) (holding that district judge abused his discretion in failing to recuse himself from criminal bench trial in which a defense witness' wife was a close personal friend of his spouse and judge had spoken to witness' wife in chambers prior to testimony).  "The very purpose of § 455(a) is to promote confidence in the judiciary by avoiding even the appearance of impropriety whenever possible."  *Id.* at 744.  "[C]onsidering that the standard of review is abuse of discretion, we will affirm a district judge's refusal to recuse

himself unless we conclude that the impropriety is clear and one which would be recognized by all objective, reasonable persons." *Bailey*, 175 F.3d at 968.

Relying on *Kelly*, Mr. Akinlade asserts that a lay observer might reasonably question the judge's impartiality because the judge recognized the two victim-witnesses as neighbors, served on a homeowners association board with one of them, and his neighborhood was allegedly a target for the fraud scheme. Unlike the situation in *Kelly*, however, the district judge here did not have a close friendship with any of the witnesses, did not express any doubt about the propriety of presiding over this case, and did not react with a personal dilemma that culminated in making comments specifically blaming the defendant for not raising recusal earlier. Notably, the judge in *Kelly* concluded that he should recuse himself but because he was concerned about double jeopardy, he gave the parties the option to seek a mistrial or proceed with a bench trial. *See Kelly*, 888 F.2d at 738-39.

Here, the district judge did not perceive grounds for recusal and simply disclosed that Mr. James and Ms. Walker owned property in his neighborhood and although he had never officially met Ms. Walker, he had seen her at two or three board meetings. On this record, Mr. Akinlade has not shown that the judge's previous contact with Mr. James and Ms. Walker objectively placed his impartiality in question. *See, e.g., United States v. Young*, 39 F.3d 1561, 1570

14

(11th Cir. 1994) ("The former business dealings between Judge Butler and a potential defense witness in this case simply do not rise to the level of manifest conflict of interest").  Given our review, we cannot say that the district judge abused his discretion by failing to recuse himself in this case.

## IV.    CONCLUSION

We affirm the district court's denial of Mr. Akinlade's motion to suppress and motion for recusal.

**AFFIRMED.**

15