[Cite as *State v. Atkinson*, 2021-Ohio-3844.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

|  |  |  |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 29076 |
| | : | |
| v. | : | Trial Court Case No. 2020-CR-1981 |
| | : | |
| JOELENE ATKINSON | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 29th day of October, 2021.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by HEATHER N. KETTER, Atty. Reg. No. 0084470, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

ANGELINA N. JACKSON, Atty. Reg. No. 0077937, Assistant Public Defender, Law Office of the Public Defender, 117 South Main Street, Suite 400, Dayton, Ohio 45422
      Attorney for Defendant-Appellant

. . . . . . . . . . . .

DONOVAN, J.

{¶ 1} Joelene Atkinson appeals from her conviction on one count of having weapons while under disability (prior drug conviction), in violation of R.C. 2923.13(A)(3), a felony of the third degree. We affirm the judgment of the trial court.

{¶ 2} Atkinson was indicted on August 31, 2020, and she pled not guilty. On November 18, 2020, Atkinson filed a motion to suppress. A hearing on the motion was held on December 29, 2020. At the start of the hearing, the court ascertained from defense counsel that the only issue before the court was the search of Atkinson's vehicle in the course of a traffic stop, which resulted in a gun being found in the glove box.

{¶ 3} Deputy Tori Bargo, a road patrol deputy with the Montgomery County Sheriff's Office, testified that she conducted a traffic stop at North Dixie Drive and Ridge Road in Harrison Township on July 5, 2020. Bargo stated that, at the time, she was monitoring the area of the Liberty Hotel on Keats Drive, which had been the subject of multiple citizen complaints. Bargo stated that, around 10:00 p.m., she observed a darker colored SUV (which turned out to be operated by Atkinson) driving down Keats Drive without headlights or taillights.

{¶ 4} Bargo pulled behind the vehicle and ran its registration on her computer; the license plate came back to a different vehicle than the one in front of her. Bargo initiated a traffic stop by activating her overhead lights. According to Bargo, Atkinson was "a little slow to pull over," eventually stopping at North Dixie and Ridge. Bargo made contact with the driver, and Deputy Thomas Barnes also arrived on scene. Bargo stated that there was also a male passenger in the car.

{¶ 5} Bargo testified that she advised Atkinson of the reason for the stop and

obtained a state identification card from her; Atkinson advised Bargo that she had just purchased the vehicle and had not yet been to the Bureau of Motor Vehicles to register it. Bargo stated that, after running Atkinson's information through LEADS, she learned that Atkinson did not have a valid driver's license and that the passenger also did not have a valid license. Bargo advised Atkinson that she was going to have the vehicle towed pursuant to Montgomery County Sheriff's Office ("MCSO") policy due to her lack of a driver's license and her fictitious plates. Bargo asked Atkinson and her passenger to step out of the car.

{¶ 6} Deputy Bargo identified a copy of the MCSO policy as Exhibit 1. She testified that, pursuant to the vehicle inventory and towing section of the policy, deputies "need to do * * * inventory of all vehicles that we tow." Bargo testified that the required inventory extended to all portions of the vehicle, and that it was done "to protect the tow company, us, as well as the owner so if they claim that something's missing, we can have it logged * * * on the tow slip that we complete. That way every party involved is protected and there's no doubt that anything is missing * * *." She stated that Atkinson and her passenger argued with her about searching and towing the vehicle. Bargo stated, however, that Atkinson consented to a search of her person and advised Bargo that she had a knife in the purse on her waist.

{¶ 7} Bargo testified that she then searched the entire the vehicle, other than the glove box. To that point, she had not "found anything else" in the vehicle. Bargo asked Atkinson for the keys to the glove box because the MCSO policy required her to search it. Bargo stated that "[a]fter a little bit of difficulty," and after arresting the passenger for obstruction, the deputies were able to obtain the keys from Atkinson. When asked why

the passenger was arrested, Bargo testified:

> He didn't want to give the keys up; he refused to give them up. When we were going to put - - put them in handcuffs so we could obtain the keys, he threw them to [Atkinson] and [Atkinson] argued with us about whether or not we should tow the vehicle or get the keys. Eventually she did give the keys once we told her she was obstructing and she could be charged.

{¶ 8} Deputy Bargo testified that, once she had the keys, she unlocked the glove box and immediately found a loaded black handgun. Bargo stated that Deputy Barnes secured Atkinson in handcuffs, and that while he did so, Atkinson said, "oh, you found my gun." Bargo secured the weapon for safety and arrested Atkinson for improper handling of a firearm in a motor vehicle. Bargo testified that she subsequently learned that Atkinson had a prior conviction for trafficking in drugs, which made her ineligible to have a weapon.

{¶ 9} Bargo stated that her entire interaction with Atkinson was recorded, and she identified State's Exhibit 2 as the disk on which the traffic stop had been recorded. Bargo testified that the recorder in her cruiser was "a little bit old," that "it skips when it gets full," and that "it jumps ahead every couple seconds."

{¶ 10} On cross-examination, Bargo testified:

> Q. So you said she pulled over at North Dixie and Ridge?
>
> A. Yes.
>
> Q. * * * Explain it like - - she pulls out of the roadway into like some parking lot in front of some building? What was that building, do you recall?
>
> A. She was still on the street but it's a half Boost Mobile – half

apartment building.

Q. * * * You got her for a noncompliance suspension and there was a fictitious plate, you stated?

* * *

A.  Yes, yes. * * *

* * *

Q.  * * * You said the policy states that you can tow for fictitious plates and no driver's license.  Can you tell me where again?

A.  I would have to look through it to find it.

Q.  I believe you were saying it was in Section B.

A.  Section B is for the vehicle inventory towing.

Q.  Now (indiscernible) Section G.  That's - - that provides the reasons to tow a vehicle.  And if those reasons were provided - - provided in there that's when you can tow based on policy from the sheriff's department?

THE COURT:  Which section did you say?

[DEFENSE COUNSEL]:  "G."

THE WITNESS: "G."

(Pause)

THE COURT:  Is there a certain part you can direct her to?

[BY DEFENSE COUNSEL]:

Q.  I - - I guess my question was just Section G is what - - the area of the policy that says when you can tow; is that accurate?

A. It does have some guidelines in there of when you can tow. I believe this section, it would be more towards abandoned vehicles and specific so like expired registrations, crash or vehicles driven by or (indiscernible) persons.

Q. * * * So it's "B" or "G" is the relevant sections to look at?

A. I can't say with 100 percent certainty. I didn't write the GOM[1]. I can't - - I don't view it [every day], obviously. I do view it when I need to but. I couldn't tell you right off the bat.

Q. Yes, Deputy. But the whole thing's provided to the judge so we can - -

A. Yes.

Q. - - have judge look at it.

So you decided to tow. And I believe you told them that you're going to tow the car so you're going to pull them out the vehicle and pat them down for weapons and search the vehicle for evidence; is that what you stated to them?

A. I advised them that I'd be doing an inventory prior to tow.

Q. * * * And this is all recorded. You can hear some parts of it; is that correct?

A. Yeah. You can hear most parts. It just kind of skips so my words are either elongated or shortened * * *.

{¶ 11} Bargo further testified that Atkinson had been "very hesitant" to provide the

---

[1] MCSO General Orders Manual.

keys, and that Atkinson had said she would "hand them straight to the tow truck driver." Bargo stated, "We advised her that she could be arrested on obstruction for not - - for hindering our inventory of the vehicle." Bargo stated that Barnes advised Atkinson that once she was placed under arrest, she would be placed in handcuffs and placed in the car. Bargo stated that the vehicle had not been reported as stolen, but she could not "confirm because it did have fictitious plates." She stated that, at the time of the stop, Atkinson was not under arrest for the traffic violations, but she was being detained so that Bargo could issue her a citation.

{¶ 12} While Bargo was testifying, the following exchange occurred:

THE COURT: If you come across a car that is abandoned on the side of the road - -

* * *

THE COURT: - - do you still tow it?

THE WITNESS: It depends if it's a hazard - -

* * *

THE WITNESS: - - to traffic.

THE COURT: * * * Obviously you wouldn't have the keys for that.

THE WITNESS: No.

THE COURT: * * * How do you inventory a car then?

THE WITNESS: At that point it would be towed to Busy Bee - -

* * *

THE WITNESS: - - and then before prior - - before release to owner they would go through the vehicle and if anything was missing at that point,

we don't have - - we don't have the means - -

* * *

THE WITNESS: - - to search.  So the liability is kind of off of us at that point.

THE COURT: * * * So for a traffic stop where you do have someone in the vehicle and you do have the keys to the car and the car is being towed - -

* * *

THE COURT: - - do you always take the key?

THE WITNESS:  Yes, ma'am.

* * *

THE WITNESS:  The tow truck driver always asks for the keys that way they don't have to pull the car possibly damaging it when they're putting it up on the tow truck.

* * *

By [Defense Counsel]:

Q.  And this car was not a hazard to traffic or anything where it was parked?

A.  It was in the trafficway.

Q.  And - -

A.  It wasn't pulled off into a parking lot or anything.

Q.  * * * And the video will show that?

A.  Yes.

Q. \* \* \* And then you're instructed that you can search a locked glove box in your policy if the keys are available, correct?

A. That would be the easiest way to search it, yes. But we - - we are supposed to search every part of the vehicle.

Q. But in the policy it says if the keys are available?

A. I can't confirm that. \* \* \*

\* \* \*

Q. And in this case, as you stated, at the time that you were searching the vehicle, [Atkinson] was not under arrest so you weren't going to take the property off of her at that time?

A. The vehicle was still going to be towed, yes.

Q. \* \* \* But [Atkinson] was not under arrest, correct?

A. She was detained. She was not under arrest at that point.

Q. And, obviously, the video shows and you agree today that she was objecting to consenting to any search or providing the keys for the search?

A. Yes. I did not need her consent for the search though.

{¶ 13} In response to a question by the court, defense counsel indicated that MCSO General Orders Manual Section 7.1.6(B)(8)(b) provides that "glove and console compartments can be searched if unlocked or if locked when the keys are available."

{¶ 14} On February 5, 2021, the court overruled the motion to suppress from the bench. The court stated:

So the questions that were presented to this Court as a result of this

hearing were (1) did the police have the authority under the tow policy to tow this particular car and if they did, * * * what part of the tow policy allowed that; and then secondly, if the tow policy was correct in that the * * * deputy here * * * could tow the car, could the officer demand the keys or threaten to arrest if Ms. Atkinson did not comply.

{¶ 15} The trial court found that Exhibit 2 confirmed that the traffic stop was valid because the vehicle had no headlights or taillights; the court also noted that the plates on the car belonged to a different vehicle and that neither Atkinson nor her passenger had a driver's license.   The court observed:

If you look at the [MCSO] Tow Policy - - it's called the General Orders Manual, Sixth Edition, Number 7.16 - - we'll call it the tow policy - - * * * 7.1.6.6(G)(2)(1), "A vehicle left unattended on private property."   So let's talk about that for a moment.

* * * So (G)(2) states, "If a vehicle is left unattended either on public or private property due to the removal of an ill, injured or arrested operator, the vehicle may be towed if the location of the vehicle or other circumstances caused the deputy to be concerned that the vehicle or its contents, if left in the present location, will be a hazard to traffic, damaged by other traffic, vandalized or stolen."

And also in (G)(1), "Deputies have the authority and responsibility to ensure the safe and efficient flow of vehicular traffic on the streets and highways.   This includes vehicles that are in violation of stopping, standing or parking while a stolen or deserted vehicle is vehicles [sic] with expired

registration, vehicles involved in a crash and vehicles driven by or controlled by - - or control of an arrested person." [Sic.]

So here the vehicle was going to be left unattended on private property.   * * * The deputy here testified that she was concerned that the vehicle or its contents, if left in their present location, could be a hazard to the traffic.

In looking at the video here, the video shows that the vehicle pulled off on the side of a road.   It was a dark road from what I could see from the video; it didn't appear there were many streetlights.   It pulled off in not a parking lot or a parking space and the car was parked in an area just directly off of the roadway and parallel to what appeared to be an apartment building.   And again, not in a parking space or in a parking lot.

And so based on the tow policy in 7.16(G)(1) and (2), I am going to find that the deputy had authority under that tow policy to tow that particular vehicle.

* * *

Here, I find that Dep. Bargo's actions of calling for a tow truck driver was reasonable because the tow policy in 7.16(G)(1) and (2) indicate that this car was going to be left unattended on private property.

Neither * * * the driver nor the passenger had a driver's license and there were fictitious plates being left on the car.   So there was no way that, in my opinion, that it would've been reasonable or wise for this deputy to simply leave this car without any licensed driver and fictitious plates in this

private property.

So I do find that it was reasonable for her to make the decision to tow this car under the policy that it would be a hazard to traffic, damaged by traffic, vandalized or stolen and, therefore, it was within her discretion to tow that car.

{¶ 16} The court next discussed the inventory search of the car, citing in part Section 7.1.6(B)(8)(b). The court noted that the policy provided that it "is okay" to search a locked glove box where a key is available. The court noted that "the question then presented here * * * [is] whether or not an individual who is not arrested for an offense but who has a key to a vehicle makes that key available." The court observed that, in the course of the video, when Atkinson was asked about the key, she said that she would not give it to the deputies but would give it to the tow truck driver when he arrived; Deputy Bargo then threatened to arrest Atkinson if she did not give Bargo the key. In analyzing what the deputy should have done in this situation, the court stated:

* * * I think that some more training would have been helpful because threatening to arrest her for an offense there was no basis for was not a reason to arrest Ms. Atkinson for failing to turn over this key. That, ultimately didn't happen but at the same time she was threatening to arrest her which forced Ms. Atkinson to go ahead and turn this key over. I found that was unnecessary and it's certainly coercive behavior when she didn't have a basis for the arrest.

But the deputy, I'm finding, would have gotten this key with some patience. The Defendant had already stated that she was going to give it

to the tow truck driver when he arrived and thus Dep. Bargo would've ultimately had access to the key per the tow policy and she could've used this key to unlock the glove box and the gun, which is obviously part of this case and what the Defense is seeking to suppress, would've been evitably [sic] * * * discovered.

So the question here is should she just have had a little patience and waited. And I believe the answer is yes, she should have. But I believe they had - - even if she'd had the patience and waited, Ms. Atkinson would've turned the key over and the key would've been given to the tow truck driver.

{¶ 17} The court cited to *State v. Kerr*, 6th Dist. Wood No. WD-05-080, 2006-Ohio-6058. In that case, the court analyzed the propriety of an inventory search as follows:

In addition, the policy provides that, incident to the inventory of a towed vehicle, the police are to inspect the outside and interior of the vehicle, including any closed or "locked" areas. Therefore, prior to having the vehicle towed, the officers' inventory of the trunk was reasonable, since they had a key which would have been given to the towing company. Once the officers saw the cylinder, indicating the possibility of additional criminal activity, however, the better course of action would have been to stop the inventory search and call for a warrant. Nevertheless, under the particular circumstances in this case, the initial search of the trunk was appropriate, not only to protect the police and towing company liability, but also, to protect the public from items which may have been potentially dangerous,

i.e., the anhydrous ammonia cylinder. Thus, the decision to tow the vehicle and then to conduct the inventory search was made substantially in accordance with standardized procedures of the Northwood Police Department.

*Id.* at ¶ 25.

{¶ 18} The trial court indicated that, here, "[w]ith some patience, the deputy would've been provided the key to be given to the tow company upon the car being towed, would've had the key and then, per the tow policy, the key is available and * * * when they have that key, it's incumbent upon them * * * to inventory the car." The court noted that, pursuant to the policy, the glove box and/or console compartments would have been searched when the key was available, and since it would have been available to the tow company upon the tow company's arrival (per Atkinson's statement that she would give the key to the tow driver), "the inventory search of the locked compartment did not violate her Fourth Amendment right * * * because the search of the car did comply with the Montgomery County Sheriff's Office tow policy and their routine procedure."

{¶ 19} The court concluded, "I don't disagree with the defense that it is troublesome that the deputy was threatening Ms. Atkinson to arrest her if she didn't turn over this key when there was no basis to arrest her." According to the court, Atkinson "wasn't going to be arrested for driving without a license; she wasn't going to be arrested for the fictitious plate. So there was no basis to arrest her for not turning over that particular key. And with no case law being out there at this point in time as to whether or not that is an arrestable offense, I can't find that she would've had a reason to arrest her." The court reiterated that Atkinson stated "very clearly" on the video that she was

going to turn the key over to the tow truck driver when he arrived, and that Bargo would have "inevitably discovered the gun" in the locked glove box.

{¶ 20} The court issued a written decision overruling the motion to suppress on February 7, 2021, and Atkinson entered a plea of no contest to having weapons under disability on February 17, 2021.   On March 15, 2021, the trial court found Atkinson guilty and sentenced her to community control sanctions not to exceed five years.

{¶ 21} On appeal from her conviction, Atkinson asserts the following assignment of error:

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTON TO SUPPRESS WHERE POLICE CONDUCTED A WARRANTLESS SEARCH OF HER AUTOMOBILE, THEREBY VIOLATING HER FOURTH AMENDMENT RIGHT TO BE FREE OF UNREASONABLE SEARCHES AND SEIZURES.

{¶ 22} Atkinson asserts that her vehicle was not lawfully impounded, and that the inventory search was accordingly unconstitutional.   Atkinson asserts that, in "determining whether an impoundment is lawful, authority to impound should never be assumed."   She argues that the trial court incorrectly found that the Sheriff's Office tow policy authorized impoundment and that the trial court's conclusion "was based on facts not in evidence."

{¶ 23} MCSO General Orders Manual Section 7.1.6(G)(2) states:

If a vehicle is left unattended either on public or private property due to the

removal of an ill, injured, or arrested operator, the vehicle may be towed if

the location of the vehicle or other circumstances cause the deputy to be

concerned that the vehicle or its contents, if left in the present location, will be a hazard to traffic, damaged by other traffic, vandalized, or stolen.

**{¶ 24}** According to Atkinson, an impoundment pursuant to this policy required three things: (1) the removal of an ill, injured, or arrested operator; (2) that renders the vehicle unattended; and (3) that presents a hazard to traffic OR a risk of damage, vandalism or theft."   She argues that, when Deputy Bargo made the decision to impound the vehicle, it was not "unattended" due to the removal of an ill, injured, or arrested operator, and therefore the policy did not apply.

**{¶ 25}** Atkinson asserts that the trial court incorrectly found that Deputy Bargo had testified that she was concerned that the vehicle could be a hazard to traffic if left where it was.   According to Atkinson, when "asked specifically if the vehicle posed a hazard to traffic because of the manner in which it was parked, Deputy Bargo did not answer in the affirmative.   She merely stated 'it was in the trafficway' without further explanation of what that meant."    Atkinson asserts that at "no point" did Bargo testify that the vehicle posed a hazard, and thus the trial court's factual finding that Bargo testified to a hazard was incorrect.

**{¶ 26}** Atkinson further asserts that the cruiser camera footage demonstrated that the vehicle was not stopped in the street, but was parked in front of a building, that it was not obstructing traffic "as cars were freely traveling both ways down the two-way street," and that Bargo never testified that she was concerned that the vehicle would be damaged, vandalized, or stolen if it was left where it was. Thus, Atkinson reasserts that impoundment was not authorized under General Orders Manual Section 7.1.6(G)(2).

**{¶ 27}** Atkinson further argues that no other grounds existed for a lawful

impoundment, because no evidence was presented that the vehicle was parked illegally or that it was blocking entrance to the building, and it was clear from Bargo's testimony that she "made the decision to impound [the] vehicle because [Atkinson] did not have a valid license and/or because the vehicle had 'fictitious plates.' " Atkinson asserts that impoundment for these reasons, standing alone, was not authorized by the tow policy.

{¶ 28} Atkinson directs our attention to *State v. Clancy,* 2d Dist. Montgomery No. 18844, 2002 WL 628124 (Apr. 19, 2002); she asserts that, like the impoundment in *Clancy*, "the impoundment in this case was unlawful and 'the resulting search [was] tainted, to the extent [it] was justified by the inventory search exception."

{¶ 29} Atkinson argues that, assuming the existence of a lawful impoundment, the tow policy states that a locked glove box should be searched "when the key is available," and "the issue turns on the interpretation of 'available.' " At the time the deputies sought to search the locked glove box, the key was in Atkinson's possession, but she was under no obligation to provide the key; further, she was not under arrest, and therefore the police had no legal right to her personal property. She argues that the tow policy did not authorize deputies to forcibly take her car keys or to threaten to arrest her for refusing to provide them. Atkinson asserts that, since the key was not in the deputies' possession when they discovered the locked glove box, it was not "available," and the manner in which the deputies procured the key was not authorized by law or by the tow policy.

{¶ 30} Atkinson asserts that the trial court appears to have upheld the search because the deputies would have inevitably come into possession of the key. But, she contends that, in reaching this conclusion, the trial court relied on several facts that were not supported by evidence: there was no evidence that the tow truck driver would have

given the key to the police; and she did not consent to a search of the glove box, but was improperly coerced. She points out that the trial court recognized that there had been no basis to arrest Atkinson, as threatened.

**{¶ 31}** Finally, Atkinson asserts that the inventory search was not reasonable and was a pretext for an evidentiary search. She notes that the search was not based upon probable cause, because it was supposed to be an inventory search. She argues that the deputies could have simply towed the vehicle with a locked glove box, as authorized by Section (B)(8)(b) of the tow policy; and there was "no indication that the department would face any liability for doing so." Atkinson notes that Bargo testified that locked vehicle cannot be inventoried before being towed, and that Section (B)(5) of the tow policy provides that an inventory will not be conducted for vehicles towed at an owner's request. She asserts that, because of these other circumstances in which vehicles are not fully inventoried before being towed, it was not reasonable to forcibly open a locked glove box "(via coercion or physical force) to 'protect property' or 'avoid liability' " where an owner, who is on the scene, "not under arrest, and capable of making decisions, elects not to unlock it prior to towing."

**{¶ 32}** According to Atkinson, the actions of the Montgomery County Sheriff were not aimed at protecting property or avoiding liability, but rather constituted an obvious ruse to allow them "to rummage through the vehicle looking for something incriminating." She asserts that Bargo first announced her intention to search the vehicle for illegal items, and only stated that she was going to tow the car after Atkinson and the passenger protested. She asserts that this "conduct is constitutionally impermissible."

**{¶ 33}** The State responds that the trial court did not err in overruling the motion to

suppress. The State directs our attention to MCSO General Orders Manual Section 7.1.6(G)(3)(d), which states:

When a deputy finds that a vehicle is left unattended upon a street/highway in violation of any of the provisions regulating stopping, standing, or parking and constitutes a definite hazard or obstruction to normal movement of traffic, the deputy is authorized to move the vehicle or require the driver or other person in charge of the vehicle to move the same to a position off the roadway. Ohio law authorizes deputies to remove and/or impound, or cause to be removed to the nearest garage or other place of safety, a vehicle found on a street/highway under any of the following circumstances:

* * *

d. When a vehicle is being driven upon the street and is not in proper condition to be driven.

{¶ 34} The State further directs our attention to Section 7.1.6(G)(6), which provides:

Illegally parked vehicles – Deputies must handle vehicles parked unlawfully on the streets in the following manner:

b. Whenever a deputy finds a vehicle unattended upon any highway, bridge, or causeway, or in any tunnel, where the vehicle constitutes an obstruction to traffic, the deputy may arrange for the removal of it.

{¶ 35} According to the State, the trial court found that MCSO tow policy (Section 7.1.6(G)(2)) applied and focused on the point that the vehicle was going to be left unattended and that, if the vehicle were left in its position, it was a hazard to traffic. The

State acknowledges that Atkinson was not "ill, injured, or arrested" as provided in Section 7.1.6(G)(2), but the tow of Atkinson's vehicle was lawful for other reasons. The State cites *State v. Holley*, 2d Dist. Montgomery No. 20371, 2004-Ohio-4264, ¶ 7, for the proposition that " '[a]n appellate court shall affirm a trial court's judgment if it is legally correct on other grounds, that is, it achieves the right result for the wrong reason, because such an error is not prejudicial.' "

{¶ 36} The State argues that, since neither occupant of the vehicle had a valid driver's license and the car had fictitious plates, including front and back plates that were different from each other, the car "was not in a proper condition to be driven" pursuant to the tow policy.

{¶ 37} The State notes that Bargo testified that the vehicle was still on the street but in front of the apartment building. It also asserts that the cruiser video showed that Atkinson's vehicle was parked perpendicular to, and blocking, the parking spaces in front of the apartment complex where the traffic stop occurred; it was illegally parked and an obstruction to traffic, but it also prevented the flow of traffic from the apartments. The State asserts that the "trial court's finding that the vehicle was a hazard is * * * supported by the record."

{¶ 38} The State notes that Atkinson did not argue in the trial court that the vehicle was not "unattended" for purposes of the tow policy, and therefore she waived this argument. It also points out that neither Atkinson nor the passenger could lawfully drive the vehicle, so "it could not be lawfully driven by anyone." Citing Exhibit 2, the State notes that Atkinson admitted she was not the registered owner of the vehicle, having not been to the BMV to register the car, and that while the car had not been reported as

stolen, Bargo could not confirm that it was not stolen because the vehicle had fictitious plates. According to the State, under these circumstances, the vehicle "necessarily would have been left in a condition where it was undriveable and in a place where it should not have been parked without the registered owner present. Thus, the vehicle was unattended." The State asserts that the towing of the vehicle was constitutionally reasonable under the circumstances.

{¶ 39} The State further argues that the inventory search was conducted in accordance with a reasonable standardized tow policy and that the gun would have inevitably been discovered. The State asserts that, because Atkinson explicitly stated that she would give the keys to the tow truck driver, then the deputy inevitably would have obtained the keys to open the glove compartment. According to the State, "the tow truck driver would have had access to the key thus also making it accessible to police."

{¶ 40} The State argues that, while Atkinson contends that the officers unlawfully obtained her keys because they threatened to arrest her, the officers could have in fact arrested her for her traffic violations, and had they done so, "they would have inevitably obtained possession of her keys." The State asserts that Deputy Bargo had, at a minimum, probable cause to arrest Atkinson for possessing a motor vehicle with fictitious plates, and she may have also had probable cause to arrest Atkinson for obstructing official business. The State asserts that, when law enforcement officers have probable cause to arrest a person, the threat to do so is not coercive and does not amount to a Fourth Amendment violation. Noting Atkinson's assertion that she did not consent to the search of the glove box and that the inventory search was "merely a pretext for an evidentiary search," the State asserts that, "because the officers could have lawfully

arrested Atkinson, the threat of arrest was not coercive and does not rise to a Fourth Amendment violation requiring suppression." The State also asserts that the evidence presented did not demonstrate that the search was a pretext for an evidentiary search.

**{¶ 41}** The State argues that towing the vehicle with the glove box locked "would have been inconsistent with the written tow policy," because if Atkinson had given them to the tow truck driver directly, as she volunteered to do, the keys would then have been "available" to law enforcement, and the tow policy would have compelled the deputies to search the glove box.

**{¶ 42}** The State asserts that Atkinson "misapplies" the policy as it relates to abandoned vehicles when no keys are available. According to the State, "coming across an already abandoned vehicle is not the same as coming into control of the vehicle and its contents through the course of police involvement."

**{¶ 43}** The State asserts that Bargo's advisement to Atkinson that the search was to make sure there was nothing illegal in the vehicle was insufficient to convert a lawful inventory search into an unlawful inventory search; the fact that Deputy Bargo indicated she was going to search for anything illegal, and then asked the general question whether there was anything illegal in the car, did not convert the tow into a pretext for an evidentiary search. According to the State, when Bargo made the statement, she had already determined that the vehicle was going to be towed because of the fictitious plates and driving without a license. She was concerned about weapons, and the evidence does not demonstrate that the inventory search was conducted as a pretext for an investigatory search.

**{¶ 44}** The State asserts that, when a Fourth Amendment violation occurs based

on a reasonable but mistaken assumption, "the person subjected to the search is not necessarily the victim of a constitutional violation," citing *Herring v. United States*, 141 Ohio St.3d 428, 2014-Ohio-4795, 25 N.E.3d 993. According to the State, Deputy Bargo reasonably believed that she was required to search the glove box pursuant to the tow policy because the keys were on scene, and Atkinson's refusal to turn over the keys and the implication of potential arrest did not render Bargo's actions unconstitutional.

{¶ 45} In reply, Atkinson asserts that her car was not abandoned pursuant to R.C. 4513.61 or unattended or obstructing traffic as described in the tow policy Section 7.1.6(G)(3)(d), and there was no evidence in the record to establish that a vehicle with invalid plates is "not in a proper condition to be driven" such as from a mechanical defect. Citing *State v. Bozeman*, 2d Dist. Montgomery No. 19155, 2002-Ohio-2588, Atkinson asserts that a court cannot find authority to impound a vehicle "that is not provided for by the policy's express terms." She asserts that, because the MCSO tow policy did not expressly provide that vehicles with unauthorized plates could be towed, there was no basis to conclude that Subsection (G)(3)(d) authorized impoundment under the circumstances of this case.

{¶ 46} Atkinson further asserts that there was no evidence that the vehicle was illegally parked, but even if it had been, impoundment would not have been authorized, noting that Bargo did not testify that the vehicle was illegally parked or that it prevented individuals from parking or entering the apartment building. According to Atkinson, even if the record had established that the vehicle was illegally parked, the MCSO tow policy prohibits impoundment of illegally parked vehicles unless there is "an immediate traffic hazard," citing MCSO General Orders Manual Section 7.1.6(G)(6)(a). Atkinson notes

Bargo's inability to identify the applicable policy provision authorizing the impoundment at the hearing.

{¶ 47} Atkinson disputes that she waived the argument that the vehicle was not "unattended." She argues that she "challenged the warrantless search in her motion to suppress" and that counsel argued during the hearing that the tow policy did not permit her vehicle to be impounded. Atkinson asserts that she did not give her consent to the search and that the doctrine of inevitable discovery did not apply. She contends that the trial court found that Deputy Bargo's threat to handcuff Atkinson and place her into the cruiser in order to obtain the key was "coercive." Citing *State v. Crawford*, 2d Dist. Montgomery No. 25506, 2013-Ohio-4398, she asserts there "was no probable cause to arrest Ms. Atkinson for obstructing official business because her refusal to produce the key was not an affirmative act."

{¶ 48} In a footnote, counsel for Atkinson notes that his "assertion in the merit brief that Ms. Atkinson had not been charged with any traffic offenses appears to be incorrect. However, given that no information regarding any traffic charges or case was before the trial court when it rendered its decision on the motion to suppress, this Court is precluded from considering that evidence here."

{¶ 49} Atkinson asserts that the fact that she ultimately produced the key did not establish that she voluntarily consented to a search of the glove box. Citing *State v. Clark*, 5th Dist. Ashland No. 15-COA-040, 2016-Ohio-4614, she asserts that she "relinquished the keys in response to a show of authority" that was far greater than in *Clark*, and Deputy Bargo testified that Atkinson had not consented to the search. Atkinson also asserts that the "inevitable discovery doctrine" did not apply, because the

record did not demonstrate that the deputies would have inevitably obtained the key from the tow truck driver.

**{¶ 50}** Finally, citing *State v. Leak*, 145 Ohio St.3d 165, 2016-Ohio-154, 47 N.E.2d 821, ¶ 30, Atkinson asserts that the "good faith exception does not apply when the evidence demonstrates that the search was pretextual." She argues that video reflects that, prior to any mention of towing the car, Deputy Bargo ordered Atkinson and the passenger out of the vehicle and stated that she was going to search the vehicle to "make sure there is nothing illegal in there," which demonstrated that she was "conducting a criminal investigation (without reasonable suspicion) to find something illegal." Atkinson argues that there was nothing in the record to show that Bargo was concerned about public safety or protecting Atkinson's valuables.

**{¶ 51}** The following is well-settled:

Appellate "review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. As the trier of fact, a trial court "is in the best position to weigh * * * evidence * * * and evaluate [the credibility of] witness[es]," so an "appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Id.*, citing *State v. Fanning*, 1 Ohio St.3d 19, 437 N.E.2d 583 (1982); *State v. Graves*, 12th Dist. Clermont No. CA2015-03-022, 2015-Ohio-3936, ¶ 9, citing *State v. Cruz*, 12th Dist. Preble No. CA2013-10-008, 2014-Ohio-4280, ¶ 12. Accepting the trial court's findings of fact as true, "the appellate court must then independently determine, without deference to the [trial court's legal] conclusion[s],"

whether the "facts satisfy the applicable * * * standard." *Burnside* at ¶ 8, citing *Fanning* and *State v. McNamara*, 124 Ohio App.3d 706, 707 N.E.2d 539 (3d Dist.1997).

*State v. Burns*, 2d Dist. Montgomery No. 28633, 2020-Ohio-2848, ¶ 8.

{¶ 52} As this Court set forth in *Clancy,* 2d Dist. Montgomery No. 18844, 2002 WL 628124; at *2-3:

We note from the outset the fundamental rule that the state bears the burden of establishing that a warrantless search, which is *per se* unreasonable, is nevertheless reasonable pursuant to one or more exceptions to the Fourth Amendment's warrant requirement. *Xenia v. Wallace* (1988), 37 Ohio St.3d 216, 524 N.E.2d 889, paragraph two of the syllabus. * * *

The inventory exception to the Fourth Amendment's warrant requirement permits police to conduct a warrantless search of a vehicle in order to inventory its contents after the vehicle has been lawfully impounded. *State v. Mesa* (1999), 87 Ohio St.3d 105, 108-109, 717 N.E.2d 329. *See South Dakota v. Opperman* (1976), 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000. The rationale for excluding inventory searches from the warrant requirement is that inventory searches are an administrative or caretaking function, rather than an investigative function. *Opperman, supra,* * * *.

While the concepts of the "inventory" exception and "impoundment" are often commingled, they constitute two distinct considerations in Fourth

Amendment jurisprudence. *U.S. v. Duguay* (C.A.7 1996), 93 F.3d 346, 352 (citing *Opperman, supra).*

"Impoundments by the police may be in furtherance of 'public safety' or 'community caretaking functions,' such as removing 'disabled or damaged vehicles,' and 'automobiles which violate parking ordinances, and which thereby jeopardize both the public safety and the efficient movement of vehicular traffic.' " *Id.* (quoting *Opperman, supra,* * * *). If not supported by probable cause, impoundment must be consistent with the police "caretaking" role, which is completely unrelated to the investigatory function. *Id.* (citing *Opperman, supra,* * * *).

The reasons that permit impoundment of a vehicle are distinct from the permissible reasons for conducting an inventory search of an impounded vehicle, "which are 'to protect an owner's property while it is the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger.' " *Id.* (quoting *Colorado v. Bertine* (1987), 479 U.S. 367, 372, 107 S.Ct. 738, 741, 93 L.Ed.2d 739, 745-46). It follows that, in order for police to perform a valid inventory search of an automobile, the vehicle must first be lawfully impounded. *Opperman, supra,* * * *; *State v. Cole* (1994), 93 Ohio App.3d 712, 715, 639 N.E.2d 859 (Cook, J.); *State v. Gordon* (1994), 95 Ohio App.3d 334, 338, 642 N.E.2d 440.

An impoundment is lawful if it is conducted pursuant to standardized police procedures. *Bertine, supra* * * *; *State v. Hathman* (1992), 65 Ohio

St.3d 403, 604 N.E.2d 743, paragraph one of the syllabus; *State v. Wilcoxson* (July 25, 1997), Montgomery App. No. 15928, unreported. Standardized procedures for impoundment are required to ensure that a subsequent inventory search is not "a ruse for a general rummaging in order to discover incriminating evidence." *Florida v. Wells* (1990), 495 U.S. 1, 4, 110 S.Ct. 1632, 1635, 109 L.Ed.2d 1, 6.

Standardized procedures might take the form of statutes or laws authorizing impoundment. * * * Standardized procedures may also be found in police regulations or municipal ordinances authorizing impoundment. *See, e.g., Gordon, supra.*

{¶ 53} In *Clancy*, the defendant was convicted of one count of carrying a concealed weapon after the court overruled his motion to suppress. *Id.* at *1. This Court determined "that while the State failed to demonstrate that the automobile was lawfully impounded, which is a necessary predicate to the inventory search exception, the search was nonetheless lawful as incident to the arrest." *Id.*

{¶ 54} We note that MCSO General Orders Manual Section 7.1.6(B) is entitled "Vehicle Inventory/ Towing and Providing Mechanical Assistance," and it provides:

6. Deputies must do an administrative inventory of all vehicles they tow. The agency's policy is to inventory all vehicles * * * deputies become involved with where the owner or owner's agent is unable to assume control of the vehicle * * *. This is necessary to protect the vehicle owner's personal property, the towing or storage company, the deputy, and the Sheriff's Office. Deputies must carefully protect and preserve any article or

property that comes under their control. This includes property or evidence that they receive, seize, recover, or that otherwise comes under their control or care.

**{¶ 55}** MCSO General Orders Manual Section 7.1.6(B)(7) provides:

If deputies discover contraband or other incriminating materials during an inventory, the deputy must seize the items following normal rules of evidence and file criminal charges where appropriate. Once an inventory has been initiated, the deputy <u>must</u> complete the inventory. * * *

**{¶ 56}** MCSO General Orders Manual Section 7.1.6(B)(8) provides:

* * * During a routine inventory, deputies must check the following areas for items of value:

* * *

b. Glove and/or console compartments (unlocked or, if locked, when the key is available.)

* * *

**{¶ 57}** Section 7.1.6(G) is entitled "Removal and Towing of Vehicles from Private Property, Public Streets, and Highways," and provides:

1. Deputies have the authority and responsibility to ensure the safe and efficient flow of vehicular traffic on the streets and highways. This sometimes requires that vehicles be removed/towed to a place of safety. The purpose of this section is to establish guidelines regarding the removal/towing of vehicles from private property, public streets, and highways for legitimate purposes. This includes vehicles that are in

violation of stopping, standing, or parking laws; stolen or deserted vehicles; vehicles with expired registrations, vehicles involved in a crash, and vehicles driven by or in the control of arrested persons.

{¶ 58} State's Exhibit 2, the video of the traffic stop, clearly reflects that Atkinson was driving a dark vehicle without headlights or taillights prior to the traffic stop. She turned right onto a roadway and parked parallel to a building on her right. After discussing the fact that Atkinson was "driving illegally" due to her lack of a valid license and the fictitious plates, Bargo advised Atkinson that she intended to search the vehicle and tow it pursuant to MCSO policy. When Atkinson argued about the search and the tow, Bargo asked her if she wanted to be handcuffed and put in the back of a cruiser. Atkinson responded in the negative, Bargo stated "give me the keys then," and Atkinson did so. (The record reflects that the key to the ignition also opened the glove box.)

{¶ 59} Atkinson mischaracterizes the record when she asserts that at no point during the hearing did Deputy Bargo testify that the vehicle posed a hazard. Bargo testified that Atkinson's vehicle "was still on the street" when she was stopped and removed therefrom. When she was subsequently asked if "the car was a hazard to traffic or anything where it was parked," Bargo responded that it "was in the trafficway," and it "wasn't pulled off into a parking lot or anything," as is reflected in the video.

{¶ 60} Regarding the impoundment of the vehicle, as noted in *State v. Leak*, 145 Ohio St.3d 821, 2016-Ohio-154, 47 N.E.3d 821, ¶ 20:

* * * Examples of vehicles taken into custody as part of law enforcement's community-caretaking role include * * * those that cannot be lawfully driven. *See* [*Opperman*] at 368-369, 96 S.Ct. 3092. The authority

of police to seize and remove from the street vehicles that impede traffic or threaten public safety and convenience is beyond challenge. *Id.* at 369, 96 S.Ct. 3092.

**{¶ 61}** In addition to remaining in the "trafficway," Atkinson's vehicle could not be lawfully driven due to its fictitious plates. R.C. 4549.08 proscribes the use of unauthorized plates and provides: "(A) No person shall operate or drive a motor vehicle upon the public roads and highways in this state if it displays a license plate or a distinctive number or identification mark that meets any of the following criteria: (1) Is fictitious." Therefore, Atkinson's vehicle was lawfully impounded in furtherance of public safety and community caretaking.

**{¶ 62}** Having found the necessary predicate to the inventory search, namely the lawful impoundment of the vehicle, MCSO General Orders Manual Section 7.1.6(B)(6) provides that the deputies "must do an administrative inventory of all vehicles they tow." The MCSO tow policy provides that "[o]nce an inventory has been initiated, the deputy must complete the inventory," and that when a key is "available," a locked glove box is to be included in the search. Bargo testified that the purpose of the inventory search was "to protect the tow company, us, as well as the owner so if they claim that something's missing, we can have it logged * * * on the tow slip that we complete," consistent with MCSO tow policy Section 7.1.6(B)(6). In other words, Bargo testified that the inventory search served a caretaking, not an investigatory, function.

**{¶ 63}** Regarding Bargo's "threat" to handcuff Atkinson that resulted in Atkinson surrendering the key to the glove box, contrary to the trial court's determination, and as the State asserts, the deputies had probable cause to arrest Atkinson for fictitious plates,

which is either a misdemeanor of the third or fourth degree.[2]   Accordingly, we agree with the State that Bargo's "threat" to handcuff Atkinson was not coercive such that her relinquishment of the key was involuntary.   *See Columbus v. Bickis*, 10th Dist. Franklin No. 09AP-898, 2010-Ohio-3208, ¶ 23 (officer's threat to arrest defendant was not coercive and did not render defendant's consent involuntary because, when the officer told defendant he would arrest him if he did not perform the field sobriety testing, the officer had probable cause to arrest defendant for OVI); *State v. Mogle*, 2d Dist. Darke No. 2020-CA-2, 2021-Ohio-1741, ¶ 18 ( " 'If the police had probable cause to arrest the person in question, a threat to do so is not coercive and thus does not render a confession involuntary.' ") Significantly, the keys were available and, pursuant to impound and inventory, the deputy had a right to demand them of Atkinson.

**{¶ 64}** Since Atkinson's vehicle was lawfully impounded pursuant to the deputies' caretaking role, and the inventory search thereof further served a caretaking and not an investigative function, the trial court did not err in overruling Atkinson's motion to suppress.

**{¶ 65}** Atkinson's assignment of error is overruled.

**{¶ 66}** The judgment of the trial court is affirmed.

. . . . . . . . . . . . .

HALL, J. and WELBAUM, J., concur.

---

[2] "Whoever violates division (A)(1) * * * of this section is guilty of operating a motor vehicle bearing an invalid license plate or identification mark, a misdemeanor of the fourth degree on a first offense and a misdemeanor of the third degree on each subsequent offense." R.C. 4549.08(C).

Copies sent to:

Mathias H. Heck, Jr.
Heather N. Ketter
Angelina N. Jackson
Hon. Mary E. Montgomery